**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion


Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED JULY 31, 2009

ROBERT HUNTER and LORIE HUNTER,

      Plaintiffs-Appellees,

v                                     No. 136310

TAMMY JO HUNTER,

      Defendant-Appellant,

and

JEFFREY HUNTER

      Defendant.

---

BEFORE THE ENTIRE BENCH

KELLY, C.J.

This child custody case requires us to examine (1) the scope of the constitutional rights of natural parents in raising their children, (2) how provisions of Michigan's Child Custody Act (CCA)[1] interact with those rights, and (3) whether the circuit court in this case applied the correct legal standards (a) in

---

[1] MCL 722.21 *et seq.*

finding defendant,[2] the children's biological mother, to be an unfit parent and (b) in awarding legal and physical custody of her four children to the children's paternal uncle and his wife.

We conclude that the circuit court did not apply the correct legal standards. We also overrule *Mason v Simmons*,[3] which the lower courts relied on, because its holding is inconsistent with the statutory language of the CCA and inconsistent with longstanding principles of Michigan custody jurisprudence. Therefore, we reverse the judgment of the Court of Appeals and remand the case to the circuit court for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

In 2002, Tammy Hunter and her husband, Jeff Hunter, lived in Indiana with their four young children, who ranged in age from two to nine years. There is no evidence in the record that Indiana child welfare authorities ever investigated or sought jurisdiction over the family. Tammy and Jeff began using crack cocaine. In August 2002, Tammy left her four children in Jeff's care at home and did not return for six days. During her absence, Jeff contacted his brother and sister-in-law in Michigan, plaintiffs Robert and Lorie Hunter, and requested their

---

[2] "Defendant" herein refers to appellant Tammy Jo Hunter.

[3] *Mason v Simmons*, 267 Mich App 188; 704 NW2d 104 (2005).

2

assistance. Robert drove to Indiana, collected the children, and returned to Michigan.

Two months later, Tammy and Jeff came to Michigan and retrieved their children, claiming that they had successfully overcome their drug addictions. A short time later, however, plaintiffs learned that Tammy and Jeff had relapsed. Plaintiffs again drove to Indiana and brought the children to Michigan. Robert testified that he and Lorie told Tammy and Jeff that "we were taking the kids . . . and told them they had to give us the kids and sign these guardianship papers." Tammy signed papers establishing a limited guardianship with plaintiffs.

Seven months later, in May 2003, Tammy and Jeff petitioned the Oakland Circuit Court to terminate plaintiffs' guardianship. However, they failed to appear at a June 2003 hearing because they were again using cocaine. On July 1, 2003, the circuit court dissolved the limited guardianship and appointed plaintiffs full guardians of the children.

Tammy's life further deteriorated when she was incarcerated in August 2004. She was released from prison in April 2005 and, three months later, filed a petition in the Oakland Circuit Court seeking an opportunity to visit her children.[4] The circuit court required her to verify her drug-free status since her release from prison. She was required to undergo biweekly drug testing, attend Alcoholics

---

[4] Tammy obtained a divorce from Jeff while he was incarcerated in Indiana. Jeff has been incarcerated on and off since 2003 and was never a party to this appeal.

Anonymous or Narcotics Anonymous meetings, and maintain weekly telephone contact with her children. She complied with each of these requirements.

On November 9, 2005, the circuit court ordered Tammy to begin paying child support and allowed supervised visits with the children. At a review hearing conducted six months later, the circuit court noted that Tammy's visitation had gone well and that she regularly paid child support. The circuit court expanded her parenting time, awarding her unsupervised weekend visits in Michigan during May and June 2006 and overnight, unsupervised visits in Indiana beginning in July 2006. The court also continued her child support obligation and ordered her to submit to weekly drug screens. She again met each of the court's requirements. By the time this case was filed, Tammy was having monthly unsupervised weekend visits with the children at her Indiana home and in Michigan.

In May 2006, plaintiffs filed this action seeking legal and physical custody of the children. The parties stipulated that the Friend of the Court (FOC) referee would make a preliminary finding regarding the children's established custodial environment and whether Tammy was a "fit parent," using *Mason v Simmons* "as its guide."

The referee determined that the children had an established custodial environment with plaintiffs and that Tammy was an unfit parent. Tammy filed objections to the referee's report and requested a hearing de novo. Ten days after receiving the referee's report, the circuit court entered another order. It required Tammy to attend parenting classes, submit to random drug screens, participate in

4

substance abuse counseling, and attend family counseling sessions with her children and her live-in boyfriend. Tammy again complied with all requirements.

At the evidentiary hearing, several witnesses testified regarding the circumstances in 2002 and 2003 that led to the establishment of plaintiffs' guardianship of the children. Tammy testified that she had remained drug-free since August 2004 and supplied the court with a compendium of negative drug screen reports. She also testified that she earned $10.50 an hour as an assistant sales manager and lived with her boyfriend in a four-bedroom home in Indiana. A family therapist who had evaluated the children pursuant to a circuit court order reported that the children were "attached" to Tammy and "have a preference to move [in] with her full time."

The circuit court concluded that Tammy was not a fit parent. In its bench ruling, the court gave its reasons:

> Now, as to the issue of mom's fitness.
>
> I believe that mom is a very nice person.
>
> That she loves these children very dearly and I think they love her.
>
> And I'm impressed by the progress that she has made.
>
> But I don't believe that her love for the children is equivalent to being a fit parent.
>
> When we look at the definition of fitness, it's not about whether she's a nice person, it is not about whether today she has made progress—and, again, she has made progress—it is about what happened in conjunction with these kids.

5

And in 2002 the parents were drug addicted.

They could not provide a home for the children and the family intervened and rather than having [Children's Protective Services] involvement and have these children go to foster care the family took over and stepped in and provided a stable and loving home for these four kids, it doesn't happen very often and it's wonderful when that does happen and I think, again, these kids are doing as well as they are today because of that intervention.

And mom has made progress but there are still numerous questions and numerous issues.

These kids have never really lived with her for the last five years.

And in Dr. [Jerome] Price's report he talks about that, that they regard going to mom's as vacation time.

They have not had to do the grueling, day to day, sort of parenting and be tested that way so we can make some determination about what the current situation is.

And mom lives with a man, who seems like a very nice individual also, a hard working person, but they live in an out of wedlock relationship and exposing the children to an out of wedlock relationship, given all of the other instability of their lives at this point is questionable judgment.

I heard his testimony that he's listed her as a beneficiary on his life insurance and he expects that he will leave her his assets should he pass away.

But the truth of the matter is she has no legal rights as a live together person.

There is a reason that we have marriage in this society and marriage protects her.

The relationship she is in gives her no protection and if at any time Mr. McConnell wants to tear up the letter, change the beneficiary, move out, he, of course is free to do so, as she is, and there are no legal ramifications to that.

So she is not really very well protected and without his assistance she cannot maintain the children.

She's been in a home for six months; that's a lease home and she admitted herself that she could not possibly maintain the children financially without Mr. McConnell being there and without his financial assistance.

So I think she has made terrific strides but I don't think she's at a point yet where we can say she is able to provide a stable and secure home for these four children, who have been out of her care for five years.

So I don't believe that's the definition of fitness.

The court then held a best interests hearing. After considering the testimony, the court agreed with the referee's findings. The court determined that 9 of the 12 best interest factors[5] favored plaintiffs and that the parties were equal with respect to 2 of the factors.[6] The court also stated on the record that it had "taken into consideration" the remaining factor, the reasonable preference of the children,[7] in reaching its decision. The court held that it was in the children's best interests to remain with plaintiffs and granted them physical and legal custody. It also ordered Tammy to pay child support and $4,000 of plaintiffs' attorney fees. The court later denied Tammy's motion for reconsideration.

Tammy filed an application for leave to appeal in the Court of Appeals. In a split, unpublished decision, the Court of Appeals majority affirmed the custody

---

[5] MCL 722.23(b), (c), (d), (e), (f), (g), (h), (j), and (*l*).

[6] MCL 722.23(a) and (k).

[7] MCL 722.23(i).

determination, but reversed the award of attorney fees.[8]  Judge Gleicher dissented. She would have reversed the custody determination because the circuit court's decision regarding parental fitness was unconstitutional and against the great weight of the evidence.  We granted leave to appeal.[9]

## II.  LEGAL BACKGROUND

We review de novo questions of law involving statutory interpretation and questions concerning the constitutionality of a statute.[10]  Findings of fact in child custody cases are reviewed under the great weight of the evidence standard.[11]

The central issues in this case are (1) what is the proper application of MCL 722.25(1) and MCL 722.27(1)(c) and (2) do the federal constitutional standards concerning the fundamental rights of parents to raise their children control our answer to the first question.

### A.  United States Supreme Court Precedent

The importance of the family and the "essential," "basic," and "precious" right of parents to raise their children are well-established in United States

---

[8] *Hunter v Hunter*, unpublished opinion per curiam of the Court of Appeals, issued March 20, 2008 (Docket No. 279862).

[9] *Hunter v Hunter*, 482 Mich 981 (2008).

[10] *Taylor v Gate Pharmaceuticals*, 468 Mich 1, 5; 658 NW2d 127 (2003).

[11] MCL 722.28; *Fletcher v Fletcher*, 447 Mich 871, 877; 526 NW2d 889 (1994).

8

Supreme Court jurisprudence.[12]  This right is not easily relinquished.  "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."[13] Therefore, to satisfy constitutional due process standards, the state "must provide the parents with fundamentally fair procedures."[14]

In 2000, in the case of *Troxel v Granville*,[15] the United States Supreme Court delivered its most relevant pronouncement in this area of the law.  In a plurality opinion, the Court struck down the state of Washington's "breathtakingly broad" visitation statute as an unconstitutional infringement on the fundamental right of parents to rear their children.[16]  The statute authorized "'any person'" to

---

[12] *Stanley v Illinois*, 405 US 645, 651; 92 S Ct 1208; 31 L Ed 2d 551 (1972), quoting *Meyer v Nebraska*, 262 US 390, 399; 43 S Ct 625; 67 L Ed 1042 (1923), *Skinner v Oklahoma*, 316 US 535, 541; 62 S Ct 1110; 86 L Ed 1655 (1942), and *May v Anderson*, 345 US 528, 533; 73 S Ct 840; 97 L Ed 1221 (1953).

[13] *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982).

[14] *Id.* at 753-754.

[15] *Troxel v Granville*, 530 US 57; 120 S Ct 2054; 147 L Ed 2d 49 (2000).

[16] *Id.* at 67.  *Troxel* also included forceful language describing the significance of parents' fundamental liberty interest in the care, custody, and control of their children.  It noted that this interest "is perhaps the oldest of the fundamental liberty interests recognized by this Court."  *Id.* at 65, citing *Meyer*, 262 US at 399, 401.

petition for visitation rights and authorized state courts to grant such visitation whenever it "'may serve the best interest of the child.'"[17]

## B. Applicable Michigan Law

In 1970, the Michigan Legislature enacted the CCA. Among its provisions are statutory presumptions that apply in custody disputes. The presumptions pertinent to this case are found in MCL 722.25(1) and MCL 722.27(1)(c). MCL 722.25(1) states:

> If a child custody dispute is between the parents, between agencies, or between third persons, the best interests of the child control. If the child custody dispute is between the parent or parents and an agency or a third person, the court shall presume that the best interests of the child are served by awarding custody to the parent or parents, unless the contrary is shown by clear and convincing evidence.

MCL 722.27(1)(c), by contrast, provides in part:

> If a child custody dispute has been submitted to the circuit court as an original action under this act or has arisen incidentally from another action in the circuit court or an order or judgment of the circuit court, for the best interests of the child the court may do 1 or more of the following:
>
> * * *
>
> (c) Modify or amend its previous judgments or orders for proper cause shown or because of change of circumstances until the child reaches 18 years of age . . . . The court shall not modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child. The custodial environment of a child is

---

[17] *Id.* at 67.

10

established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered.

Thus, a conflict arises between these sections when a court hears a custody dispute between a child's natural parent and a third party with whom the child has an "established custodial environment." This Court has not addressed the proper application of these sections of the CCA in such cases.

On numerous occasions before *Troxel* was decided, the Court of Appeals considered the interplay of these two presumptions. Panels of the Court came to conflicting conclusions about how to reconcile them.[18] However, after *Troxel*, in *Heltzel v Heltzel*, the Court recognized that, to properly protect a parent's fundamental liberty interest, the presumption of MCL 722.25(1) in favor of the natural parent must control.[19]

---

[18] Compare *Rummelt v Anderson*, 196 Mich App 491; 493 NW2d 434 (1992), and *Glover v McRipley*, 159 Mich App 130; 406 NW2d 246 (1987) (cases where both presumptions were applicable. They held that the natural parent has the burden. He or she must prove by a preponderance of the evidence that the best interests of the child are served by placement with the parent), with *Deel v Deel*, 113 Mich App 556; 317 NW2d 685 (1982), *Siwik v Siwik*, 89 Mich App 603; 280 NW2d 610 (1979), *Stevens v Stevens*, 86 Mich App 258; 273 NW2d 490 (1978), and *Bahr v Bahr*, 60 Mich App 354; 230 NW2d 430 (1975) (holding that the parental presumption controls unless the third party shows by clear and convincing evidence that custody with the natural parent is not in the best interests of the child).

[19] *Heltzel v Heltzel*, 248 Mich App 1, 26-27; 638 NW2d 123 (2001) ("We do not believe, however, that the Legislature intended that in every custody dispute between a noncustodial natural parent and a third-person custodian, the

11

*Heltzel* further concluded that it was imperative that trial courts balance the two significant interests. First, the lower courts must adequately safeguard the fundamental constitutional nature of the parental liberty interest. Second, they must simultaneously maintain the statutory focus of the CCA on the best interests of the child. To achieve this balance, *Heltzel* held:

> [C]ustody of a child should be awarded to a third-party custodian instead of the child's natural parent only when the third person proves that all relevant factors, including the existence of an established custodial environment and all legislatively mandated best interest concerns within [MCL 722.23], taken together clearly and convincingly demonstrate that the child's best interests require placement with the third person.[20]

The Court of Appeals thoroughly considered *Heltzel*'s analysis when it decided *Mason*. It noted that no published Court of Appeals case had addressed the applicability of *Heltzel* in cases in which a natural parent was unfit or had neglected or abandoned a child.[21]

Without citing authority to support its conclusion, *Mason* then distinguished *Heltzel*, saying that it applies only to custody disputes involving fit

---

third-person custodian could eliminate the fundamental constitutional presumption favoring custody with the natural parent, and thus arrive on equal footing with the parent with respect to their claim of custody to the parent's child, merely by showing that the child had an established custodial environment in the third person's custody. This interpretation . . . fails to take into proper account the parents' fundamental due process liberty interest in childrearing.").

[20] *Id.* at 27.

[21] *Mason*, 27 Mich App at 198.

12

parents.  It held that when "a parent's conduct is inconsistent with the protected parental interest, that is, the parent is not fit, or has neglected or abandoned a child, the reasoning and holding of *Heltzel* do not govern."[22]  *Mason* thus affirmed the trial court's determination that the defendant was not entitled to the constitutional deference afforded a fit parent under *Heltzel* and *Troxel*.  It extended that reasoning to justify denying the natural parent the benefit of the statutory presumption in MCL 722.25(1).

## III.  THE CCA'S PROTECTIONS

Custody cases involving natural parents inherently implicate the parents' fundamental liberty interest in the care, custody, and management of their children.[23]  Thus, they implicate the constitutional protections identified in the United States Supreme Court cases previously discussed.  The threshold question this Court must address is whether the relevant provisions of the CCA adequately protect a fit parent's fundamental rights under existing United States Supreme Court precedent.

### A.  Under *Troxel*, MCL 722.25(1) Must Control Over MCL 722.27(1)(c) in Order to Adequately Protect Fit Parents' Fundamental Rights

*Troxel* established a floor or minimum protection against state intrusion into the parenting decisions of fit parents.  It invalidated the state of Washington's

---

[22] *Id.* at 206.

[23] *Santosky*, 455 US at 753.

13

third-party visitation statute as a violation of a natural parent's fundamental rights. It reasoned that the Washington statute was flawed because it afforded no deference to a fit parent's decision about his or her children's best interests.[24] Rather, the statute allowed "any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review."[25] *Troxel* also forbade courts from overturning decisions by a fit custodial parent based "solely on the judge's determination of the child's best interests."[26] Rather, it held that courts must give some "special weight" to the parents' determination of their children's best interests.[27]

The constitutional protection in *Troxel* centers on the "traditional presumption that a fit parent will act in the best interest of his or her child."[28] The Washington statute's lack of deference to a fit parent's decision was inconsistent with the presumption that fit parents act in the best interests of their children. Hence, it was constitutionally infirm. Using that reasoning, *Troxel* established that a natural parent's fitness to parent is the touchstone for invoking the constitutional protections of fundamental parental rights. The application of the statutory

---

[24] *Troxel*, 530 US at 67.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 70.

[28] *Id.* at 69.

14

presumption in MCL 722.25(1) must therefore be considered specifically in the context of a fit parent to determine whether it satisfies constitutional scrutiny under *Troxel*.

In *Heltzel*, our Court of Appeals recognized *Troxel*'s mandate: In order to protect a fit natural parent's fundamental constitutional rights, the parental presumption in MCL 722.25(1) must control over the presumption in favor of an established custodial environment in MCL 722.27(1)(c). We agree.

Several considerations compel this conclusion. First, *Troxel* explicitly requires courts to give some deference to a parent's decision to pursue custody because it is inherently central to the parent's control over his or her child.

By contrast, unlike the parental presumption in MCL 722.25(1), no constitutional protections for third persons underlie the established custodial environment presumption in MCL 722.27(1)(c). This Court has held that no constitutional or statutory basis exists for third parties to have standing to seek child custody solely because they have an established custodial relationship with the child.[29]

---

[29] *Bowie v Arder*, 441 Mich 23, 43; 490 NW2d 568 (1992) (rejecting the argument that the CCA created a substantive right of a third party to seek custody of a child with whom the third party has an established custodial relationship. The *Bowie* Court observed that "[t]here is simply no provision of the [CCA] that can be read to give a third party . . . a right to legal custody of a child on the basis of the fact that the child either resides with or has resided with that party"); *In re Clausen*, 442 Mich 648, 682-684; 502 NW2d 649 (1993) (rejecting the argument that United States Supreme Court precedent established a federal constitutional

15

Finally, we note that the vast majority of Michigan cases interpreting the CCA support the conclusion that these presumptions were not meant to be given equal weight.[30] This conclusion is also in accord with Michigan's longstanding history of affording great respect to parental authority while consistently recognizing that the best interests of the child control the analysis.[31] For these reasons, we conclude that, when these presumptions conflict, the presumption in MCL 722.27(1)(c) must yield to the presumption in MCL 722.25(1).[32]

_____

right of a third party to seek custody of a child with whom the third party has an established custodial relationship).

We note that plaintiffs have standing to pursue this custody action by virtue of their status as the children's legal guardians. MCL 722.26b(1).

[30] *Bowie*, 441 Mich at 43 (holding that an established custodial environment does not establish a substantive basis on which to sue for custody under the CCA); *Deel*, 113 Mich App at 561 ("*Stevens* holds that the presumptions should be *recognized* equally, not *weighted* equally, and the language used in the statutes suggests that the presumptions are not, in fact, of equal weight.") (emphasis in original). The few cases that have held otherwise have since been rejected as unconstitutional under *Troxel*. E.g., *Heltzel*, 248 Mich App at 21-23 ("reject[ing]" *Rummelt* and declining to follow its "unconstitutional[]" application of the CCA). *Rummelt* and its predecessors had resolved the conflict in the statutory presumptions. They said that the natural parent must show by a preponderance of the evidence that removing the child from an established custodial environment was in the child's best interests.

[31] *Fletcher*, 447 Mich at 889 ("[T]he primary goal of the Child Custody Act . . . is to secure custody decisions that are in the best interests of the child."); *Greene v Walker*, 227 Mich 672, 677-681; 199 NW2d 695 (1924) (citing cases).

[32] "'[A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act.'" *Bowerman v Sheehan*, 242 Mich 95, 99; 219 NW 69

16

A remaining constitutional question involves the amount of deference due under *Troxel* to fit parents. We conclude that the statute provides sufficient deference to a fit natural parent's fundamental rights to the "care, custody, and management of their child . . . ."[33] We so hold because the statute requires, in order to rebut the parental presumption, clear and convincing evidence that custody by the natural parent is not in a child's best interests.

The clear and convincing evidence standard is "the most demanding standard applied in civil cases . . . ."[34] This showing must "'produce[] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'"[35]

We agree with the Court of Appeals in *Heltzel* that, given the unique constitutional considerations in custody disputes involving natural parents, "it is not sufficient that the third person may have established by clear and convincing evidence that a marginal, though distinct, benefit would be gained if the children

---

(1928), quoting Justice Holmes in *Blodgett v Holden*, 275 US 142, 148; 48 S Ct 105; 72 L Ed 206 (1927).

[33] *Santosky*, 455 US at 753.

[34] *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995).

[35] *Id.* (citations omitted).

were maintained with him."[36]  A third party seeking custody must meet a higher threshold.  He or she must establish by clear and convincing evidence that it is not in the child's best interests under the factors specified in MCL 722.23 for the parent to have custody.  This is entirely consistent with *Troxel*'s holding.  Although a fit parent is presumed to act in his or her child's best interests, a court need give the parent's decision only a "presumption of validity" or "some weight."  That is precisely what MCL 722.25(1) does when it requires clear and convincing evidence to rebut the presumption.

Given our determination that (1) the parental presumption in MCL 722.25(1) prevails over the presumption in favor of an established custodial environment in MCL 722.27(1)(c) and that (2) the parental presumption can be rebutted only by clear and convincing evidence that custody with the natural parent is not in the best interests of the child, we conclude that MCL 722.25(1) satisfies constitutional scrutiny under *Troxel*.[37]

---

[36] *Heltzel*, 248 Mich App at 28.

[37] Our constitutional analysis is further supported by a comparison with similar statutes in other states.  The CCA's provisions governing custody disputes between a natural parent and a third party are more deferential to the natural parent than some, but less deferential than others.  Michigan appears to fall near the middle of the spectrum.  At one end are the strict "parental rights" jurisdictions, which base a parent's right to custody on the fitness of the parent.  At the opposite end are the "best interests" jurisdictions, which base custody exclusively on the child's needs and welfare. The standards in between usually give preference to the biological parent through a rebuttable presumption that the best interests of the child are served by giving custody to the natural parent.  See, generally, anno: *Award of custody where contest is between child's parents and grandparents*, 31

18

ALR3d 1187, 1197-1198; *In re Guardianship of Jane Doe*, 93 Hawaii 374, 384-385; 4 P3d 508 (Hawaii App, 2000).

Under the doctrine most deferential to natural parents, the parents are entitled to the custody of their children unless (1) it clearly appears that they are unfit, or (2) they have abandoned their right to custody, or (3) "extraordinary circumstances" exist that require they be deprived of custody. *Id.; Ex parte GC, Jr*, 924 So 2d 651, 656 (Ala, 2005) (requiring "clear and convincing evidence" of parental unfitness to rebut the presumption in favor of the natural parent) (citations omitted); *State ex rel KF*, 2009 Utah 4, P67; 201 P3d 985 (2009) (requiring evidence of three factors establishing unfitness in order to rebut the presumption in favor of the natural parent). Most courts using this standard rarely evaluate the best interests of the child when resolving the issue. Rebutting the parental presumption in the states using this standard typically hinges on a determination of unfitness. Hence, this standard undoubtedly provides sufficient deference to a natural parent's decisions regarding the care, custody, and maintenance of his or her child to satisfy *Troxel*.

Michigan, along with many other states, applies an intermediate parental presumption standard that favors the biological parent. It is rooted in the *Troxel* rationale that custody with the natural parent serves the best interests of the child. Usually nonparents may rebut the presumption favoring the parent only by a showing of clear and convincing evidence that custody with the natural parent is not in the child's best interests. MCL 722.25(1); *In re Guardianship of Doe*, 93 Hawaii at 385.

The standard least deferential to the natural parent's wishes is often referred to simply as the "best interests of the child standard." It focuses on the interests of the child and defines the relative benefits to the child of being with one or the other party. It requires the court to compare the totality of the circumstances of the two potential custodians, usually on the basis of statutory considerations similar to those embodied in MCL 722.23. Courts using this standard typically grant custody by determining, by a preponderance of the evidence, which placement is in the best interests of the child.

The states that use this best interests of the child standard often give some deference to the natural parent. But they are less deferential to the natural parent's wishes than Michigan is in MCL 722.25(1). For example, Or Rev Stat 109.119 (2007) provides a parental presumption. But it allows a third party having an established parent-child relationship with the child to rebut it. The third party

## B. *Troxel* Does Not Require a Threshold Determination of Parental Fitness in Custody Cases If No Statutory Requirement Exists

Defendant and some of the amici curiae argue that this Court must read into the statute an implicit requirement for a fitness determination in order to protect parents' fundamental rights. Even if the presumption in MCL 722.25(1) supersedes the presumption in MCL 722.27(1)(c), defendant argues that the court must make a preliminary determination whether a natural parent is a fit parent. Thus, defendant insists, *Troxel* prevents courts from allowing a third party to rebut the presumption using a best interests analysis because it would insufficiently protect the parent's rights.

Defendant relies on *In re JK* in support of her argument. In that case, this Court stated that "[a] due-process violation occurs when a state-required breakup of a natural family is founded solely on a 'best interests' analysis that is not supported by the requisite proof of parental unfitness."[38] Defendant urged us to examine the Probate Code, the Juvenile Code, and other sections of Michigan law to adopt a test for evaluating parental fitness. She claims that, to satisfy

---

need produce a mere preponderance of the evidence that granting custody to the third party is in the best interests of the child. The Oregon Supreme Court upheld the statute in the face of a due process challenge based on *Troxel*. *In re O'Donnell-Lamont & Lamont*, 337 Or 86; 91 P3d 721 (2004).

[38] *In re JK*, 468 Mich 202, 210; 661 NW2d 216 (2003), citing *Quilloin v Walcott*, 434 US 246, 255; 98 S Ct 549; 54 L Ed 2d 511 (1978).

constitutional scrutiny, such a test must be based on objective factors similar or identical to those listed in those statutes.

We reject defendant's arguments as beyond the scope of the holdings of *Troxel* and *In re JK*. As noted previously, *Troxel* carefully limited the constitutional scope of the parental presumption to the extent that a court need give decisions by fit custodial parents only a "presumption of validity."[39] Since MCL 722.25(1) applies a substantial presumption of the validity of decisions by all parents, including fit custodial parents, the constitutional underpinnings of *Troxel* are satisfied.[40]

---

[39] Other jurisdictions whose courts have considered the proper application of *Troxel* in similar legal contexts have also rejected the idea that *Troxel* mandates a determination of parental fitness. Rather, in the context of motions to terminate a guardianship or to modify custody in favor of a natural parent, many courts have distinguished *Troxel* because it "was concerned with judicial interference in the day-to-day child-rearing decisions of fit, custodial parents. . . . It did not address situations in which the parent no longer has custody." *In re MJK*, 200 P3d 1106, 1109 (Colo App, 2008), citing *In re Guardianship of LV*, 136 Cal App 4th 481, 493; 38 Cal Rptr 3d 894 (2006); see also *In re MNG*, 113 SW3d 27, 33 (Tex App, 2003).

[40] Defendant would have the Court require a demonstration of parental unfitness before allowing the parental presumption to be rebutted where no such demonstration is required by the statute. That would in effect, give unlimited deference to all parenting decisions of parents deemed to be fit. However, "[a] determination that an individual has a fundamental right does not foreclose the State from ever limiting it." *In re RA*, 153 NH 82, 102; 891 A2d 564 (2005). Such a determination is not constitutionally mandated. To hold that parental unfitness is a mandatory prerequisite to rebutting the parental presumption would be inconsistent with the CCA's emphasis on best interests and lack of reference to fitness.

*In re JK* is distinguishable from the case before us. It was a case involving termination of parental rights. Termination cases introduce a significantly heightened intrusion upon a parent's fundamental right to parent because they involve an all-or-nothing proposition: whether a parent's right to be a parent and make decisions regarding his or her child's upbringing is permanently severed. It follows logically that under circumstances where the parental interest is most in jeopardy, due process concerns are most heightened.

A custody award to a third party, by contrast, represents a lesser intrusion into the family sphere. It does not result in an irrevocable severance of parental rights or "'a unique kind of deprivation'" that forces parents to confront the state.[41] The Legislature has addressed these concerns by requiring the state to prove parental unfitness by "clear and convincing evidence" in termination cases. It has

---

We note that our interpretation of the relevant provisions of the CCA is similar to that of the courts in many jurisdictions that also utilize an intermediate parental presumption standard. *In re Guardianship of Doe*, 93 Hawaii at 385 ("Because the preference for parents established in [Hawaii Rev Stat] 571-46(1) is coupled with the best interest standard, we believe our jurisdiction is similar to the majority of jurisdictions which adopt a custody presumption in favor of parents subject to rebuttal."); *Evans v McTaggart*, 88 P3d 1078, 1085 (Alas, 2004) ("We thus hold that in order to overcome the parental preference a non-parent must show by clear and convincing evidence that . . . the welfare of the child requires the child to be in the custody of the non-parent.").

[41] *Santosky*, 455 US at 759 (citation omitted).

listed specific statutory factors that it has determined make a parent per se unfit and warrant terminating his or her rights to a child.[42]

The quoted language from *In re JK* is inapplicable in custody cases such as this because it does not involve the "state-required breakup" of a family. In termination cases, the natural parent and the state are the parties to the action. To protect the parental interest from improper state intrusion, the Legislature requires the state to prove by clear and convincing evidence that at least one statutory ground for termination exists. Hence, the state must show that the natural parent is unfit.

In custody cases, by contrast, the state does not initiate the proceedings in which the natural parent's rights are at stake. Rather, custody determinations in cases such as this merely give "recognition to a family unit already in existence . . . ."[43] Under such circumstances, "[w]hatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that [its decision was] in the 'best interests of the child.'"[44]

---

[42] MCL 712A.19b(3).

[43] *Quilloin*, 434 US at 255.

[44] *Id.*

23

Finally, we note that a natural parent's fitness is an intrinsic component of a trial court's evaluation of the best interest factors in MCL 722.23.[45] Therefore, although we hold that due process does not require a fitness determination where the statute does not mandate it, we observe that fitness is an inextricable component of the court's inquiry.

For example, MCL 722.23(f) to (g) require the trial court to compare the "moral fitness" and the "mental and physical health" of the parties. These factors reflect the legislative determination that concerns about parental fitness are of paramount importance in custody determinations. Therefore, MCL 722.25(1) uses the clear and convincing evidence standard to safeguard the constitutionally protected fundamental rights of fit custodial parents, as identified in *Troxel*. MCL 722.23, on the other hand, simultaneously fulfills the legislative purpose of maintaining the focus of the inquiry on the best interests of the child.

C. *Mason* Erroneously Interpreted MCL 722.25(1)
by Adding a Determination of Fitness

We again note, as a preliminary observation, that MCL 722.25(1) does not refer to fitness of the natural parent as a prerequisite for applying the statutory presumption in the parent's favor. MCL 722.25(1) applies to all natural parents who are parties in custody disputes with third persons, not merely fit natural

---

[45] 31 ALR3d 1187, 1196 (noting that the probable reason courts have often used the fitness and best interest inquiries interchangeably is because of "the fact that both doctrines seek the same basic objective from two different approaches").

parents. Nothing in the statute explicitly or implicitly suggests that the presumption applies only in cases involving a parent adjudged to be a fit parent. Rather, we believe that, in enacting the CCA, the Legislature set forth clear best interest factors in MCL 722.23 that constitute a de facto evaluation of each individual's fitness to raise a child.[46] In doing so, the Legislature rejected the amorphous fitness/neglect/abandonment standard outlined in *Mason* by not including any reference to that standard.[47]

*Mason* erred by holding that the statutory presumption in the natural parent's favor applies only to fit parents. This was an improper interpretation of *Heltzel*, *Troxel*, and the CCA generally. The statutory presumption in MCL 722.25(1) is "'a presumption of the strongest order[,]'"[48] and one that "does not turn solely on the question of fitness."[49] Numerous cases decided since the CCA was enacted have agreed: the parental presumption controls unless the third party

---

[46] It is difficult to conceive of a scenario where an unfit parent would prevail on the best interest factors.

[47] *Bahr*, 60 Mich App at 359 ("Since the Legislature is presumed to be aware of the long-standing judicial precedent affecting an area in which an exhaustive codification of the law is undertaken and enacted, we must conclude the omission was intentional."); compare MCL 712A.19b(3) (specifically providing for termination of parental rights in cases of neglect or abandonment, among other reasons).

[48] *Deel*, 113 Mich App at 561-562, quoting *Bahr*, 60 Mich App at 359.

[49] *In re Weldon*, 397 Mich 225, 276-277; 244 NW2d 827 (1976) (opinion of Coleman, J.), overruled on other grounds in *Bowie*, *supra*.

shows by clear and convincing evidence that custody with the natural parent is not in the best interests of the child.[50]

As discussed earlier in this opinion, the parental presumption has some constitutional provenance, whereas the custodial environment presumption has none. This persuades us that the parental presumption should properly control over the established custodial environment presumption.

*Mason* held that the parental presumption controls with regard to fit parents only because they alone are constitutionally protected. *Mason* further held that unfit parents have the burden "to show, by a preponderance of the evidence, that a change in the established custodial environment with the guardian was in the child's best interests."[51]

However, *Mason* and its predecessors created this new standard out of thin air.[52] In the case before us, the Legislature has provided us with two standards that irreconcilably conflict. Rather than resolve the conflict by divining a new

---

[50] *Henrikson v Gable*, 162 Mich App 248, 253; 412 NW2d 702 (1987); *Stevens*, 86 Mich App at 267; *Bahr*, Mich App at 360.

[51] *Mason*, 267 Mich App at 207.

[52] *Glover*, 159 Mich App at 147 ("We believe that placing the burden of persuasion on the parent challenging an established custodial environment is better calculated to elicit the quality of testimony and evidence required by a trial court in its determination of the best interest of the child."). What remains unanswered in *Glover* is on what basis the Court rests this questionable proposition and why, in any event, that determination justified the invention of a new standard. See *Rummelt*, *supra* at 496 ("For the reasons stated therein, we agree with this Court's decision in *Glover*.").

standard, as *Mason* did, we believe that the better course is to decide which of the two presumptions controls.

We are convinced that the parental presumption must control. We are persuaded of this (1) by the fact that, whereas the parental presumption has some constitutional provenance, the established custodial environment presumption does not, (2) by caselaw interpreting the tension between MCL 722.25(1) and MCL 722.27(1)(c) and (3) by the lack of reference to fitness in the CCA. The Court is unwilling to restrict the parental presumption absent clear evidence from the Legislature that a restriction was intended. Moreover, the CCA's notable silence regarding fitness, abandonment, or neglect of children suggests these words should not be read into the statute.

The statutory presumption favoring natural parents is not contravened merely because the statute provides greater protection for parental rights than *Troxel* mandated as a constitutional matter. *Mason*'s contrary holding is contradictory to the weight traditionally afforded to the parental presumption.[53]

_____

[53] *Mason*'s holding altered the burden of proof in that it essentially applied the best interests of the child standard to disputes between unfit natural parents and third-party custodians, in contravention of the language of MCL 722.25(1). *Mason*, 267 Mich App at 207; see footnote 37 of this opinion.

Five years after the enactment of the CCA, the Court of Appeals in *Bahr*, *supra*, rejected the exact argument accepted by *Mason*. *Bahr* first noted that, before the enactment of the CCA, the best interests of the child were served by awarding custody to the natural parent over a third party "unless it could be affirmatively proven that the parent was unfit to have custody or had neglected or abandoned the child." *Bahr*, 60 Mich App at 359. After concluding that the

Because the parental presumption in MCL 722.25(1) satisfies the constitutional standards mandated for fit parents, no justification existed for *Mason* to restrict that presumption only to fit parents. Nothing in *Troxel* can be interpreted as precluding states from offering *greater* protection to the fundamental parenting rights of natural parents, regardless of whether the natural parents are fit. This rule applies here.

---

Legislature had deliberately omitted from the CCA any fitness determination in such cases, *Bahr* plainly stated that "[r]ebuttal of the presumption in favor of parental custody no longer requires proof of parental unfitness, neglect or abandonment." *Id.* at 360.

Numerous Court of Appeals cases decided after *Bahr* cited it favorably for the proposition that, in custody cases between a natural parent and a third party, the CCA requires no fitness determination. *Stevens*, 86 Mich App at 267; *Henrikson*, 162 Mich App at 253 (1987). Oddly, *Mason* quoted the same language from *Bahr* concerning the lack of need for a fitness determination under the CCA. *Mason* noted that "some jurisdictions, including Michigan, have moved away from using the 'parental unfitness' or 'extraordinary circumstances' standards and focus on a placement's detriment to the child." *Mason*, 267 Mich App at 201. The Court also noted that the parental presumption in MCL 722.25(1) applies "in *all* custody disputes between parents and an agency or a third person." *Id.* (emphasis in original). Yet immediately after this discussion, *Mason* ignored its own correct statement of law about the statutory presumption in MCL 722.25(1). Instead, it denied the parental presumption favoring the natural father on the basis of the fact that he was not entitled to the fundamental constitutional right to raise his child. *Id.* at 203.

We recognize that *Mason* was not bound by *Bahr* and its progeny under MCR 7.215(J)(1) because it was decided before 1990. However, we refer to *Bahr* here because it correctly stated Michigan custody law after the enactment of the CCA; *Mason* did not. We agree with the interpretation of the CCA promulgated by the *Bahr* line of cases. We further agree that the *Rummelt* line of cases must be rejected on the basis of *Heltzel*'s reasoning and for the reasons discussed herein.

28

Defendant also argues that *Mason*'s arbitrary and subjective fitness standard, and the trial court's equally subjective application of that standard in this case, violated her Fourteenth Amendment[54] due process rights. She claims that, because the *Mason* standard does not utilize objective criteria for evaluating parental fitness, it lacks procedural protections sufficient to protect her due process rights. Given our holding that *Mason* improperly limited the parental presumption in MCL 722.25(1), we find it unnecessary to reach defendant's constitutional argument.

We conclude that *Mason* erred by reading a fitness requirement into the parental presumption in MCL 722.25(1). The statute is entirely silent on the issue of a parent's fitness.[55] Nothing in the statute or the CCA generally[56] suggests that parental fitness is a prerequisite to entitlement to the parental presumption in MCL

---

[54] US Const, Am XIV.

[55] Justice Corrigan acknowledges as much, *post* at 17, but brushes this "bare observation" aside. We disagree with Justice Corrigan's contention that we fail to "adequately consider the various proceedings at which a parent's fitness may be questioned." *Post* at 17. To the contrary, we explicitly address such proceedings by holding that a natural parent whose parental rights were previously terminated or are suspended cannot initiate an action under the CCA. See pp 30-31 of this opinion.

[56] Only one provision in the CCA refers to parental fitness at all. MCL 722.27b requires a court considering whether to grant visitation time to grandparents to give deference to a fit parent's decision to deny such time. This provision was amended in 2004 in response to our decision in *DeRose v DeRose*, 469 Mich 320; 666 NW2d 636 (2003). *DeRose* held that the former version of MCL 722.27b was unconstitutional under *Troxel*.

722.25(1). Because *Mason*'s holding was neither constitutionally mandated nor consistent with the statute, *Mason* is hereby overruled.

### D. Additional Concerns

Justice Corrigan's concurrence raises a number of issues that we believe deserve a response regarding the scope of this opinion. We offer the following observations to more explicitly address what this opinion does *not* do:

(1) This case deals with custody actions initiated under the CCA involving both the parental presumption in MCL 722.25(1) and the established custodial environment presumption in MCL 722.27(1)(c). This opinion should not be read to extend beyond CCA cases that involve conflicting presumptions or to cases that involve parental rights generally but are outside the scope of the CCA.

(2) This opinion does not create any new rights for parents. The United States Supreme Court decisions regarding the constitutional rights of parents previously discussed in this opinion provide guidance that informs our analysis. This opinion does not magically grant parents additional rights or a constitutional presumption in their favor. It does not grant unfit parents constitutional rights to their children other than due process rights.

(3) Parents may not bring actions under the CCA and invoke the parental presumption in MCL 722.25(1) as an end run around previous custody determinations. We agree with Justice Corrigan's conclusion that [p]rinciples of collateral estoppel generally prevent a party from relitigating an issue already

30

established in the first proceeding."[57]   This Court has long recognized the applicability of these principles to probate court orders such as the guardianship orders in this case.[58]   Subsequently, we reiterated that "orders of probate courts have the force and effect of judgments and are *res judicata* of the matters involved and cannot be attacked collaterally."[59]

Therefore, a parent whose rights have been terminated or suspended cannot initiate an action for custody under the CCA because it would amount to a collateral attack on the earlier proceedings.  A termination order, by its nature, finds that custody with the natural parent is not in the child's best interests.  A parent's only recourse in such cases is to appeal the order.  A guardianship order, similarly, suspends a parent's parental rights and grants those rights in the child, including a right to physical and legal custody, to the guardian under MCL 700.5215.  Thus, defendant in this case would have been collaterally estopped from initiating a custody action under the CCA.  A parent's recourse under these circumstances is to file a motion to terminate the guardianship.[60]

---

[57] *Post* at 18.

[58] *Chapin v Chapin*, 229 Mich 515; 201 NW 530 (1924).

[59] *In re Ives*, 314 Mich 690, 696; 23 NW2d 131(1946).

[60] MCL 700.5208.

In sum, collateral estoppel principles provide a sufficient basis to preclude parents from initiating an action for custody under the CCA in order to circumvent valid court orders affecting custody.[61]

---

[61] Given this limitation, we reject Justice Corrigan's assertion that we are allowing a court to sweep "findings and admissions [of unfitness] under the rug." *Post* at 20. Under Justice Corrigan's approach, a parent who is deemed unfit by a court or admits being unfit at any time is never entitled to benefit from the parental presumption in MCL 722.25(1). Thus, defendant in this case is not entitled to the presumption in her favor because "defendant's unfitness was clearly established at prior proceedings." *Post* at 20. Justice Corrigan's approach is contrary to *Fletcher*'s mandate that a court consider up-to-date information "and any other changes in circumstances" when making custody determinations. *Fletcher*, 447 Mich at 889.

Our position is not that *Fletcher* precludes a circuit court from taking into account a past finding of parental unfitness. *Post* at 19 n 13. Surely, when a court evaluates the best interest factors in MCL 722.23, a past finding may still be considered. Determinations of past, admitted unfitness are inevitably reconsidered when there are ongoing proceedings before the court. Indeed, as Justice Corrigan observes, "a parent's fitness or custody rights are governed by an ongoing proceeding—such as the guardianship proceeding here." *Post* at 6. We do not ourselves opine on whether "defendant's lack of fitness here diminished." *Post* at 19 n 13. We simply observe that the judge overseeing the guardianship proceedings acknowledged such a progression in his increasingly generous visitation orders.

Thus, our main disagreement with Justice Corrigan's conclusion is the extent to which she would make a prior finding of unfitness largely dispositive in resolving the conflicting presumptions in the CCA. Here, plaintiffs relied primarily on defendant's past conduct as a basis for opposing her requests for increased visitation. Nevertheless, the court overseeing the guardianship proceedings repeatedly ruled in defendant's favor. During those proceedings, defendant was fulfilling increasing duties to her children and gaining increased visitation time. By complying with what the court required of her, defendant properly attempted to overcome the prior finding of unfitness that plaintiffs rely on heavily in this custody action. Indeed, had defendant filed a motion to terminate the guardianship under MCL 700.5208, her admission of unfitness would have been relevant. But the relevance would have been only to the extent that it still

## IV. PLAINTIFF'S BURDEN OF PROOF ON REMAND

Given our conclusion that *Mason* incorrectly interpreted MCL 722.25(1), we remand this case for reevaluation under the correct legal standards.[62] On remand, the circuit court shall conduct a new best interests hearing in which it must consider all relevant, up-to-date information.[63] At that hearing, the court shall apply MCL 722.25(1) in defendant's favor. The court shall not grant custody to plaintiffs unless plaintiffs demonstrate by clear and convincing evidence that custody with defendant does not serve the children's best interests.[64] In order to

affected the best interests of the children. Justice Corrigan states that defendant's current fitness may certainly be given weight during the best interests analysis. *Post* at 20 n 14. Yet she would make the initial admission of unfitness dispositive of which presumption controls when an established custodial environment has been established and "when a parent's lack of fitness continues over time." *Post* at 20 n 13. This case is an apt illustration of how such an analysis begs the question. Is the establishment of the established custodial environment due to the parent's unfitness sufficient in itself? It would appear not, because the parent's lack of fitness must also "continue[] over time." In this case, has defendant's "lack of fitness," diminished as the probate court found it to be, extended over a long enough time? How much time must a parent be unfit, and how unfit must he or she be?

[62] Defendant's remaining arguments claim that the circuit court abused its discretion by finding her to be an unfit parent and in evaluating the best interests factors in MCL 722.23. Given that we are remanding this case for a new best interests hearing, we decline to address these arguments.

[63] *Fletcher*, 447 Mich at 889.

[64] Under the CCA, the court is not required to award custody to *either* party. Thus, if the plaintiffs do not meet the requisite burden of proof in this custody action, the court has the authority to keep the guardianship intact without awarding custody to either party. That is, on remand, the court could do a number of different things, including, but not limited to: (a) "[a]ward the custody of the

33

make this showing, plaintiffs must prove that "all relevant factors, including the existence of an established custodial environment and all legislatively mandated best interest concerns within [MCL 722.23], taken together clearly and convincingly demonstrate that the child's best interests require placement with the third person."[65]

## V. CONCLUSION

We hold that the established custodial environment presumption in MCL 722.27(1)(c) must yield to the parental presumption in MCL 722.25(1). The parental presumption can be rebutted only by clear and convincing evidence that custody with the natural parent is not in the best interests of the child. We also hold that MCL 722.25(1) satisfies constitutional scrutiny under *Troxel*. Due process does not require a threshold determination of parental fitness in custody cases. The Court of Appeals decision in *Mason* v *Simmons* is overruled. We reverse the judgment of the Court of Appeals and remand this case to the circuit court for a new best interests hearing. We do not retain jurisdiction. Finally,

---

child[ren] to 1 or more of the parties involved or to others," MCL 722.27(1)(a); (b) maintain the status quo; or (c) "[t]ake any other action considered to be necessary," MCL 722.27(1)(e). As noted earlier in this opinion, the defendant-mother cannot circumvent the existing guardianship order by initiating a custody action. Rather, the only action she may initiate is to terminate the guardianship under MCL 700.5208.

[65] *Heltzel*, 248 Mich App at 27. In this way, the established custodial environment is still given weight in the court's analysis and ultimate decision. Therefore, we do not believe this holding "minimize[s] the importance that the CCA's terms place on the established custodial environment." *Post* at 16 n 11.

defendant's motion to preserve the confidentiality of the psychiatric evaluation report is granted. The report shall be removed from the copies of the plaintiffs' appendix and placed under seal.

Marilyn Kelly
Michael F. Cavanagh
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

35

S T A T E   O F   M I C H I G A N

SUPREME COURT

ROBERT HUNTER and LORIE HUNTER,

      Plaintiffs-Appellees,

v                                                                    No. 136310

TAMMY JO HUNTER,

      Defendant-Appellant,

and

JEFFREY HUNTER

      Defendant.

---

BEFORE THE ENTIRE BENCH

WEAVER, J. *(concurring in part and dissenting in part)*.

I join in the reversal of the Court of Appeals result and in the remand of this case to the trial court for a new best interests hearing for the reasons stated in the following parts of Chief Justice Kelly's majority opinion and Justice Corrigan's partially concurring and partially dissenting opinion, which are as follows:

With respect to Chief Justice Kelly's majority opinion, I join in parts I, II, III(B), and III(D).

With respect to Justice Corrigan's partially concurring and partially dissenting opinion, I join in part III, with the exception of footnote 12.

                                              Elizabeth A. Weaver

STATE OF MICHIGAN

SUPREME COURT

ROBERT HUNTER  and LORIE HUNTER,

        Plaintiffs-Appellees,

v                                         No. 136310

TAMMY JO HUNTER,

        Defendant-Appellant,
and

JEFFREY HUNTER,

        Defendant.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, J. (*concurring in part and dissenting in part*).

I concur in parts I, II, III(B), and III(D) of the majority opinion.  I agree with the majority's conclusion that "fit" parents benefit from a constitutional presumption that they will "act in the best interests of their children."  *Troxel v Granville*, 530 US 57, 68; 120 S Ct 2054; 147 L Ed 2d 49 (2000) (plurality opinion of O'Connor, J.); see *ante* at 13-14.  I further agree that, when prior court proceedings govern child custody—such as child protective proceedings under the Juvenile Code, MCL 712A.1 *et seq.*, or, as in this case, guardianship proceedings under Part 2 of Article V of the Estates and Protected Individuals Code (EPIC), MCL 700.5201 *et seq.*,—these proceedings generally have preclusive effect and the prior court has superior jurisdiction.  A parent cannot circumvent these

proceedings by seeking custody under the Child Custody Act (CCA), MCL 722.21 *et seq*. See *ante* at 30-31.

I do not agree with the majority that the constitutional presumption in favor of *fit* parents imbues the presumption in MCL 722.25(1) of the CCA—which applies to *all* parents, not just fit ones—with heightened constitutional meaning so that it always prevails over the mandate concerning established custodial environments in MCL 722.27(1)(c). I do agree that constitutional considerations require the presumption in § 5(1) to predominate in the case of a fit parent. However, when a parent's lack of fitness has been previously established or admitted *and* a third party has an established custodial environment with the child, that parent should not benefit from the presumption in § 5(1). Section 7(1)(c) governs instead.

## I.  PROCEDURAL BACKGROUND

As the majority explains in part, *ante* at 2-7, this case began in 2002 when defendant and her husband—who were drug-addicted, unemployed, and unable to care for their four young children—voluntarily relinquished custody of the children to plaintiffs. Plaintiffs, who are the children's aunt and uncle, had already been caring for the children intermittently. In November 2002, defendant and her husband petitioned the court[1] to appoint plaintiffs as limited guardians for the

---

[1] The majority observes that all proceedings in this case took place in the Oakland Circuit Court although there were two separate cases: the probate court guardianship case and the circuit court CCA case. It is helpful to note that the Family Division of the Oakland Circuit Court and the Oakland County Probate

2

children, stating: "We are currently in active addiction to crack cocaine and are unable to care for our children until we seek treatment." Accordingly, they voluntarily suspended their parental rights and the court established a limited guardianship with plaintiffs. Plaintiffs thus gained rights and responsibilities akin to those of a parent with regard to the children under MCL 700.5215, which states, in most pertinent part: "A minor's guardian has the powers and responsibilities of a parent who is not deprived of custody of the parent's minor and unemancipated child . . . ." See MCL 700.5206(4).[2]

---

Court share jurisdiction over selected matters pursuant to a concurrent jurisdiction plan authorized by MCL 600.406. Thus, although probate courts generally have jurisdiction over guardianship proceedings and circuit courts have jurisdiction over CCA proceedings, all the proceedings between the parties in this case effectively took place before the same court. Even absent a concurrent jurisdiction plan, the probate judge assigned to a guardianship matter must be assigned to serve as the circuit court judge in a subsequent CCA case brought by the guardians. MCL 722.26b(5). Here Judge Eugene A. Moore presided over the guardianship proceedings but later disqualified himself in the CCA matter. The CCA proceedings were ultimately presided over by Judge Linda S. Hallmark. Judges Moore and Hallmark are both Oakland County Probate Court judges assigned to the Family Division of the Oakland Circuit Court.

[2] By design, limited guardianships give parents the opportunity to correct whatever conditions led them to give up custody of their children and to regain custody upon proof of compliance with a limited guardianship placement plan. MCL 700.5205(2). A parent has the right to petition to terminate the limited guardianship under MCL 700.5208 and, if the parent has "substantially complied" with the placement plan, the court must terminate the guardianship. MCL 700.5209(1). A limited guardian also may not seek full custody of a child under the CCA if the parent substantially complies with the placement plan. MCL 722.26b(2). Before establishing a limited guardianship, however, the parent must also be informed that, if he fails without good cause to comply with the placement plan, his parental rights may be terminated under the Juvenile Code. MCL 700.5205(2).

3

Defendant could have regained custody of the children by substantially complying with her placement plan, in which she promised to seek drug treatment and provide a drug-free household for the children. Instead, she and her husband continued their drug use and became involved in crime. Although they petitioned to terminate the limited guardianship in May 2003, the court denied their petition and, instead, ordered them to continue drug treatment, verify their employment, and maintain more regular visitation with the children. Nonetheless, they returned to crime. They were arrested. After being released on bail, they stole a car and fled the police.

In June 2003, plaintiffs petitioned the court to appoint them full guardians.[3] Plaintiffs cited their fear for the children's safety and stated that the police advised them to seek a full guardianship and suspension of parental visits. The court-appointed guardian ad litem for the children investigated and confirmed that defendant and her husband were still using drugs, had lost their jobs, were not paying rent, and had fled the police. On June 17, 2003, the court conducted a hearing on plaintiffs' petition. Neither parent appeared and their whereabouts were unknown. The court suspended their visitation rights until further order. On July 16, 2003, the court appointed plaintiffs full guardians of the children.

Defendant and her husband were subsequently rearrested and incarcerated. Defendant apparently skipped bail again after her second release. She was

_____

[3] MCL 700.5204(3) empowers a limited guardian to seek appointment as a full guardian as long as the petition is not based merely on the suspension of parental rights incident to the limited guardianship petition.

4

ultimately convicted and imprisoned in August 2004. In July 2005, after her release from prison, defendant sought visitation with her children. By this time she had not seen them in over two years. The court restored her visitation rights in November 2005 and defendant began paying a small amount of child support. After several months of successful visits and regular child support payments, the court ordered expanded, unsupervised parenting time to begin in May 2006, with overnight visits at defendant's home in Indiana to begin in July 2006. By this time, the children had been living with plaintiffs in Michigan for about four years.

In May 2006, apparently prompted by the order increasing defendant's visitation rights, plaintiffs exercised their rights under MCL 722.26b to seek custody under the CCA and to stay the guardianship proceedings. MCL 722.26b(4). Defendant counterclaimed for custody under the CCA. The court employed the now-outdated rubric in *Mason v Simmons*, 267 Mich App 188; 704 NW2d 104 (2005), to declare defendant unfit and award custody to plaintiffs.[4]

## II. SUPERIOR JURISDICTION OF PRIOR PROCEEDINGS

First, I agree that the guardianship proceedings here precluded defendant from separately seeking custody under the CCA. *Ante* at 30-31. Generally, when two courts have concurrent jurisdiction, the first court that acquired jurisdiction retains it until the matter is fully resolved. See *Schell v Schell*, 257 Mich 85, 88;

---

[4] I concur in the majority's conclusion that *Mason* improperly created a preponderance of the evidence standard "out of thin air," *ante* at 26, where the text of the CCA includes no such standard.

5

241 NW 223 (1932).[5]  Accordingly, if a parent's fitness or custody rights are governed by an ongoing proceeding—such as the guardianship proceeding here or a child protective proceeding under the Juvenile Code—the parent may not separately invoke the circuit court's jurisdiction by filing a simultaneous custody action under the CCA.

Because this holding is a crucial element of the majority opinion, I offer an example to illustrate the importance of this jurisdictional rule.  Child protective proceedings under the Juvenile Code are designed to protect children from abuse and neglect—often by temporarily removing them from their parents' custody under emergency conditions—while aiding parents to rectify unfit conditions and regain custody of their children.  The purposes of these proceedings would be

---

[5] The longstanding rule concerning concurrent jurisdiction was aptly described in *Schell* where, as here, the circuit court was called upon to decide a custody issue.  Significantly, in *Schell*, prior probate court proceedings concerning the child appear to have been abandoned and effectively closed.  Accordingly, this Court held:

> As stated by Mr. Justice COOLEY in [*Maclean*] *v. Wayne Circuit Judge*, 52 Mich. 257 [259; 18 NW 396]:

> "It is a familiar principle that when a court of competent jurisdiction has become possessed of a case, its authority continues, subject only to appellate authority, until the matter is finally and completely disposed of; and no court of co-ordinate authority is at liberty to interfere with its action."

> *The circuit court and the probate court, juvenile division, had concurrent jurisdiction.  The former court having acquired it first, retained it.*  [*Schell*, *supra*, 257 Mich 88 (emphasis added).]

nullified if a parent could avoid them by regaining custody in a separate proceeding under the CCA.

The Juvenile Code protects children who, among other things, are subjected to abuse, neglect, or unfit living conditions. MCL 712A.2(b).[6] The code empowers the Department of Human Services (DHS) to petition for temporary removal of a child from his parent's home for these reasons. The court may authorize the petition "upon a showing of probable cause that 1 or more of the allegations in the petition are true and fall within the provisions of section 2(b) . . . ." MCL 712A.13a(2). If the court orders the child's removal from the parent's custody and orders the child into court or state custody, a process begins during which the DHS works with the parent, if possible, to restore custody with the parent.[7] As I will explain further, this process is statutorily designed to take up

---

[6] The most relevant provisions of MCL 712A.2(b) confer court jurisdiction over a child:

> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . . .

> * * *

> (2) [Or, w]hose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in.

[7] Various protections address the parent's due process rights throughout the proceedings, including rights to notice, to participate in all proceedings, see MCL

7

to one year. See MCL 712A.19a(1). Within 30 days of the child's removal, and every 90 days thereafter, the DHS must provide service plans detailing its efforts and the services provided to prevent removal or to rectify the conditions that caused removal, as well as the efforts to be made and services to be offered to facilitate the child's return to his parent, if appropriate. MCL 712A.18f. The court generally reviews the case within 182 days of the child's removal and every 91 days thereafter. MCL 712A.19(3). At each review hearing, the court must evaluate the parent's compliance with the service plan, MCL 712A.19(6) and (7), and may order additional services or actions. MCL 712A.19(7)(a).

If a child remains outside his home, the court must conduct a permanency planning hearing within one year of the child's removal. MCL 712A.19a(1). At that hearing, if the court determines that the "return of the child to his or her parent would not cause a substantial risk of harm to the child's life, physical health, or mental well-being, the court shall order the child returned to his or her parent." MCL 712A.19a(5). If the court determines that the parent poses a substantial risk to the child, it may order the DHS to initiate proceedings to terminate parental rights. MCL 712A.19a(6). If termination is not in the child's best interests, the court may also consider alternative placement plans, including a guardianship. MCL 712A.19a(7). Crucially, the burden of proof is elevated to clear and

---

712A.19(5)(c), MCL 712A.19a(4)(c), and MCL 712A.19b(2)(c), and to an attorney at each stage of the proceedings, MCL 712A.17c(4) and (5).

convincing evidence only at this final stage, the termination of parental rights proceeding. MCL 712A.19b(3).

Because of the different evidentiary standards in the CCA and the Juvenile Code, a parent could subvert child protective proceedings if the *Schell* rule did not mandate superior jurisdiction in the child protective proceedings. This is because, as noted, the requisite conditions for removal of a child from his parent's custody under MCL 712A.2(b) of the Juvenile Code must be proved by "a showing of probable cause," MCL 712A.13a(2). But, particularly under the majority's interpretation of the CCA, the DHS or a third party custodian can prevent a parent from regaining custody under the CCA only by rebutting the parental presumption *by clear and convincing evidence*. MCL 722.25(1). Because the CCA creates a higher burden for a third party seeking custody, the parent could regain custody under the CCA; while the initial conditions warranting emergency removal may have been supported by *probable cause*, the DHS may not yet have gathered enough evidence to meet the heightened *clear and convincing* evidence standard of the statutory presumption in MCL 722.25(1), as would be necessary to prevent the parent from immediately regaining custody. Thus, if the parent could seek custody under the CCA, the Legislature's carefully crafted child protective process—which both protects children *and* ultimately benefits willing parents—could be nullified.

A related problem involving guardianships would arise if a parent could invoke the court's jurisdiction under the CCA although the parent's rights were

9

eligible for termination under the Juvenile Code. Indeed, although the court may conclude that a child should not be returned to his parent because the parent poses an ongoing substantial risk of harm, the court may place the child with a permanent guardian in lieu of terminating the parent's rights. MCL 712A.19a(6) and (7)(c). That guardianship may continue until the child is emancipated, MCL 712A.19a(7)(c), and the guardian gains all the traditional parent-like rights and duties inherent in a guardianship established under the EPIC. MCL 712A.19a(8). If the natural parent could nonetheless obtain custody under the CCA, the purposes and terms of these pre-termination guardianships would be obviated. Particularly under the majority's rule, the parent could file under the CCA to shift the burden to the guardian, thereby requiring the guardian to prove by clear and convincing evidence that placement with the parent is not in the child's best interests. The court's determination during the child protective proceedings that the parent posed a significant harm to his child would become irrelevant and the guardian would be forced to litigate in defense of his appointment. In addition to subverting the statutory scheme in favor of pre-termination guardianships, this result likely would cause voluntary guardians to decide against accepting guardianship appointments.[8]

In sum, important, practical reasons undergird the *Schell* rule and the principles of collateral estoppel addressed by the majority. Once a court attains

---

[8] Indeed, the EPIC's guardianship schemes could be effectively nullified, generally, if a parent could avoid ongoing guardianship proceedings by simply filing for custody under the CCA.

10

jurisdiction of a child's custody under the Juvenile Code or the EPIC, as the first court to attain jurisdiction over these matters, it retains jurisdiction until the proceeding is closed. *Schell*, *supra*, 257 Mich at 88. A parent cannot simply file separately for custody under the CCA and regain custody by invoking the parental presumption. Permitting a parent to do so would undermine the very purposes of the other statutory schemes addressing custody and child welfare, not to mention the havoc and confusion in courts attempting to properly protect children and adjudicate parental rights under the correct statutes.

Finally, the CCA itself confirms this result by providing a single, explicit exception to the normal application of the *Schell* rule. MCL 722.26b, which grants a guardian standing to seek custody under the CCA, provides the only apparent context in which a CCA action may override decisions of another court with ongoing jurisdiction over the parties' rights to the children.[9] MCL 722.26b(4) explicitly states that, when a guardian seeks custody, "guardianship proceedings concerning that child in the probate court are stayed until disposition of the child custody action" and permits an ensuing circuit court order to supersede probate court orders concerning the guardianship of the child. The CCA does not, in turn, permit a parent with the limited rights inherent in guardianship proceedings to sue for custody or stay the guardianship proceedings.

---

[9] To be clear, although the CCA generally cannot be used to override other proceedings, the CCA is often properly employed *incident to* other proceedings when appropriate. For example, custody actions may "arise[] incidentally from another action in the circuit court or an order or judgment of the circuit court," MCL 722.27(1), including a divorce action.

Rather, as the majority notes, a parent's recourse would lie in his explicit right to petition the probate court to terminate the guardianship under MCL 700.5208.

III. SECTIONS 5(1) AND 7(1)(c) OF THE CHILD CUSTODY ACT

Although I agree with the majority on the point just discussed, I disagree with the majority's resolution of the apparent conflict between MCL 722.25(1) and MCL 722.27(1)(c) as it applies here, where the guardians invoked MCL 722.26b. I certainly agree with the majority, *ante* at 9, that the "fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982). And thus, to satisfy constitutional due process standards, the state "must provide the parents with fundamentally fair procedures." *Id*. at 754; and see *ante* at 9. But, when a parent's unfitness has been established, as it was here, fundamentally fair procedures do not require the court to give that parent the full benefit of the parental presumption. Rather, a parent's rights to a child are limited when he has failed in his duties to that child. In the majority's own words, neither *Troxel* nor the majority opinion "grant[s] *unfit* parents constitutional rights to their children other than due process rights." *Ante* at 30 (emphasis added).

Thus, the presumption that a parent will act in his child's best interests is a *conditional presumption* that applies *only* "so long as a parent adequately cares for" his child. *Troxel*, *supra*, 530 US 68 (O'Connor, J.). Indeed, the parental right

12

derives from a parent's 'high duty' to care for his children. *Id.* (citation omitted).[10]

Accordingly, when a parent fails to care adequately for his child—and particularly

[10] In accord, historically this Court has recognized that parental rights do not derive from mere biology or exist independently from parental duties. As we explained in *In re Gould*, 174 Mich 663, 669-670; 140 NW 1013 (1913):

> The law recognizes the rights of the father *because it recognizes the natural duties and obligations of the father*. The father's right to and authority over his child are secure and inviolable *so long as he properly discharges the correlative duties*.

> But the absolute power of the father over his infant children, to treat them as property and dispose of them as he sees fit because they are his, which was once recognized under the Roman law of *patria potestas* and in the codes of early nations, no longer obtains. Paternal authority is subordinate to the supreme power of the State. *Every child born in the United States has, from the time it comes into existence, a birthright of citizenship which vests it with rights and privileges, entitling it to governmental protection—*

> "And such government is obligated by its duty of protection, to consult the welfare, comfort, and interests of such child in regulating its custody during the period of its minority." *Mercein v. People*, 25 Wend. (N. Y.) 64 (35 Am. Dec. 653).

> *The power of parental control, though recognized as a natural right and protected when properly exercised, is by no means an inalienable one*. When the "right of custody" is involved between respective claimants for a child, the courts, though in the first instance recognizing *prima facie* rights of relationship, in the final test are not strictly bound by demands founded upon purely technical claims or naked legal rights, but may and should, in making the award, be governed by the paramount consideration of what is really demanded by the best interests of the child. [Emphasis added.]

Thus *Gould* emphasized that a child's rights to be protected from abuse and neglect inform and limit a parent's rights. As we reiterated 50 years later in *Herbstman v Shiftan*, 363 Mich 64, 67-68; 108 NW2d 869 (1961):

> *A child also has rights*, which include the right to proper and necessary support; education as required by law; medical, surgical

when third parties carry out the parent's high duty in his stead—the automatic presumption in favor of the parent no longer strictly applies. Therefore, although fit parents benefit from a constitutional presumption that they will "act in the best interests of their children," *Troxel*, *supra*, 530 US 68, *ante* at 13-14 the constitutional presumption in favor of *fit* parents does not imbue the presumption in § 5(1) of the CCA with heightened constitutional meaning so that it always prevails over the mandate concerning established custodial environments in § 7(1)(c) without regard to a parent's fitness.

MCL 722.25(1) states that if a child custody dispute "is between the parent or parents and an agency or a third person, the court shall presume that the best interests of the child are served by awarding custody to the parent or parents, unless the contrary is established by clear and convincing evidence." But the powers of the circuit court in any action under the CCA are also governed by MCL 722.27, which circumscribes the orders a court may enter regarding a complaint for custody. MCL 722.27(1) states, in pertinent part:

> If a child custody dispute has been submitted to the circuit court as an original action under this act or has arisen incidentally

> and other care necessary for his health, morals, or well-being; the right to proper custody by his parents, guardian, or other custodian; and the right to live in a suitable place free from neglect, cruelty, drunkenness, criminality, or depravity on the part of his parents, guardian, or other custodian. It is only when these rights of the child are violated by the parents themselves that the child becomes subject to judicial control. *A parent having violated the rights of a child forfeits his right to the custody, control and upbringing of that child; and when the safety and best interests of the child demand it, the rights of the child must be protected by the court*. [Emphasis added.]

14

from another action in the circuit court or an order or judgment of the circuit court, for the best interests of the child the court may do 1 or more of the following:

(a) Award the custody of the child to 1 or more of the parties involved or to others and provide for payment of support for the child, until the child reaches 18 years of age. . . .

(b) Provide for reasonable parenting time of the child by the parties involved, by the maternal or paternal grandparents, or by others, by general or specific terms and conditions. . . .

(c) Modify or amend its previous judgments or orders for proper cause shown or because of change of circumstances . . . . The court shall not modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child. The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered. . . .

(d) Utilize a guardian ad litem or the community resources in behavioral sciences and other professions in the investigation and study of custody disputes and consider their recommendations for the resolution of the disputes.

(e) Take any other action considered to be necessary in a particular child custody dispute. [MCL 722.27(1).]

Subsection 7(1)(c) clearly mandates that the court "*shall not* modify or amend its previous judgments or orders or issue a new order so as to *change the established custodial environment of a child unless there is presented clear and convincing*

15

*evidence that it is in the best interest of the child.*"[11]  (Emphasis added.)  Thus, §

(7)(1)(c) expressly *deprives the court of the power* to change the established

custodial environment absent the requisite showing by clear and convincing

evidence that such a change is in the child's best interest.[12]  Yet the majority

[11] The majority opines that "no constitutional protections for third persons underlie the established custodial environment presumption in MCL 722.27(1)(c)." *Ante* at 15.  This may be so.  But we should not minimize the importance that the CCA's terms place on the established custodial environment, which serves a *child's* needs.  Indeed, an "established custodial environment" is defined in terms similar to those used to describe a child's "rights and privileges entitling it to governmental protection," which obligate the government "to consult the welfare, comfort, and interests of such child in regulating its custody during the period of its minority."  *Gould*, *supra*, 174 Mich at 670 (internal quotation marks and citation omitted).  An established custodial environment exists under § 7(1)(c) "if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort."  Compare the rights of a child listed by *Herbstman*, *supra*, 363 Mich at 67: "proper and necessary support; education as required by law; medical, surgical, and other care necessary for his health, morals, or well-being; the right to proper custody by his parents, guardian, or other custodian . . . ."

[12] My conclusions here stem from my willingness to agree, for purposes of this analysis, with the majority's assumption that MCL 722.25(1) and MCL 722.27(1)(c) "irreconcilably conflict" when a parent seeks custody from a third party with an established custodial environment, *ante* at 26; both provisions appear to mandate action from the court, stating respectively that "the court *shall* presume that the best interests of the child are served by awarding custody to the parent," § 5(1), and that "[t]he court *shall not* . . . change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child," § 7(1)(c). (Emphasis added.)  Yet because § 7 broadly circumscribes the circuit court's power in *all* cases under the CCA, I would be more inclined to hold that the prohibition on changing an established custodial environment in § 7(1)(c) clearly controls, as a textual matter, whenever the terms of both § 5(1) and § 7(1)(c) apply in a given case.  I do not agree with the majority that, through § 5(1), the Legislature clearly intended to "offer[] *greater* protection [than is required by the constitution] to the fundamental parenting rights of natural parents, regardless of whether the natural parents are fit." *Ante* at 28.  Nevertheless, my observations concerning the textual dominance of  7(1)(c) are largely inapposite to my overall conclusion; I am persuaded that, if

directs circuit courts to ignore this mandate in *all* cases where *any* natural parent—except one whose parental rights were previously terminated or suspended, *ante* at 31—seeks custody from a third party with an established custodial environment.

But in light of the strong mandate expressed in § 7(1)(c), and because the constitutional parental presumption applies only to *fit* parents, I would hold that the presumption in § 5(1) prevails over the mandate in § 7(1)(c) by necessity *only* when a *fit* parent seeks custody from a third person with an established custodial environment. Where an unfit parent is concerned, no statutory or constitutional reason exists to simply ignore § 7(1)(c) if a third person has an established custodial environment.

Further, because the constitutional parental presumption applies *only* to *fit* parents, a parent's fitness remains relevant. I acknowledge that the CCA does not refer to fitness, see *ante* at 27. But this bare observation does not adequately consider the various proceedings at which a parent's fitness may be questioned—indeed, it does not consider the very proceedings that likely led to a custodial environment being established with a third party custodian in the first place.

*Troxel* equated a fit parent with one who "adequately cares for his or her children." *Troxel*, *supra*, 530 US 68 (O'Connor, J.). It illustrated the presumption in favor of fit parents as "a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult

a *fit* parent's custody interests are opposed to those of a third party with an established custodial environment, the parent should benefit from a parental presumption as a matter of *constitutional* right.

17

decisions." *Id.* at 68 (internal quotation marks and citation omitted). Various proceedings call upon courts to make findings, or call upon parents to make admissions, *counter* to these presumptions in order to fulfill the state's duties to protect its children. The child protective proceedings described above and guardianship proceedings like this case are good examples of proceedings that, by their nature, may establish a parent's unfitness. Principles of collateral estoppel generally prevent a party from relitigating an issue already established in a prior proceeding. See *Storey v Meijer, Inc*, 431 Mich 368, 373 n 3; 429 NW2d 169 (1988). Indeed, as the majority observes, this Court has "long recognized" the applicability of collateral estoppel, including to "probate courts orders such as the guardianship orders in this case." *Ante* at 31, citing *Chapin v Chapin*, 229 Mich 515; 201 NW 530 (1924). Such orders "are *res judicata* of the matters involved and cannot be attacked collaterally." *In re Ives*, 314 Mich 690, 696; 23 NW2d 131 (1946). Further, permitting a parent to avoid past findings or admissions of unfitness *and nonetheless gain a constitutional advantage despite unfitness* clearly runs the risk of endangering the child and compromising state laws aimed at upholding the state's duties to its child citizens. Most significant to our purposes, if a parent's lack of fitness has been established, there is no longer a constitutional reason to ignore the mandate in MCL 722.27(1)(c) in favor of MCL 722.25(1). Accordingly, I conclude that in cases where a parent's lack of fitness was either

18

determined or admitted in a prior proceeding, the parent cannot later claim fitness

and benefit from the presumption in § 5(1) in a proceeding under the CCA.[13]

<hr>

[13] The majority states that my approach is contrary to *Fletcher v Fletcher*, 447 Mich 871, 889; 526 NW2d 889 (1994), which required the trial court on remand to consider "up-to-date information" and "any other changes in circumstances" when awarding custody. See *ante* at 32 n 61. I have no objection to the *Fletcher* Court's requirement, which applied to the trial court's consideration of the best interests factors in MCL 722.23. But I disagree with the majority's assertion that *Fletcher* precludes a trial court from taking into account a past finding of unfitness when determining whether the presumption in MCL 722.25(1) must prevail over the mandate in MCL 722.27(1)(c) as a constitutional matter. *Fletcher* addressed *only* the best interests determination on remand in light of the fact that circumstances may change during the appellate process. See *Fletcher*, *supra* 447 Mich at 888-889. Indeed, it expressly prohibited reconsideration of the threshold question whether any party had an established custodial environment for purposes of applying § 7(1)(c). *Id.* at 889 n 10 ("We do not suggest that the events which have taken place during the appellate process give rise to an 'established custodial environment' that . . . alters the burden of proof in favor of the party who has enjoyed custody during the appeal."). In no way did *Fletcher* suggest that the threshold issue of a parent's past, admitted unfitness should be reconsidered over time in order to alter the burden of proof.

The majority further states that I would "make the initial admission of unfitness dispositive" although defendant "was fulfilling increasing duties to her children and gaining increased visitation time." *Ante* at 32 n 61. First, I would note that—just as the majority asserts that the established custodial environment may be given weight when the court considers the best interests factors, *ante* at 34 n 65—defendant's current, apparently increasing ability to care for her children should certainly be given weight during this process. Second, to the extent that the majority suggests that a past admission of unfitness should not be dispositive because defendant's lack of fitness here diminished and should be reconsidered over time, I note that defendant admitted her unfitness in 2002, had no contact with her children at all for approximately two years during 2003-2005, was released from prison in July 2005 and had been back in contact with her children for only about six months when plaintiffs filed their complaint for custody in May 2006. By this time, the children had been living with plaintiffs in Michigan for about four years. Accordingly, I emphasize my conclusion that a past admission of unfitness is not dispositive *in itself.* Rather, by its terms the mandate in § 7(1)(c)—which circumscribes the court's power to "[m]odify or amend its previous judgments or orders" and specifically to "modify or amend its previous judgments or orders or issue a new order so as to change the established custodial

19

Here, defendant and her husband admitted unfitness in 2002 when they sought the limited guardianship because they were jobless, addicted to crack, and unable to care for their children. They could have regained custody of the children by substantially complying with their placement plan. Instead, they relapsed, continued their involvement with crime, and failed to appear at the hearing on plaintiffs' petition to establish a full guardianship.[14] Under these circumstances, defendant's unfitness was clearly established at prior proceedings. Indeed, defendant admitted her unfitness and willfully forewent her statutorily granted right to regain custody despite the admission. Defendant further could have challenged the results of the guardianship proceedings by appealing, but she did not do so. The court should not now be directed to sweep such findings and admissions under the rug by applying a constitutional presumption in favor of *fit*

---

environment"—controls *only* when a prior admission of unfitness led to additional circumstances and court orders creating an established custodial environment with a third party. Indeed, by definition, the prohibition on changing the established custodial environment in § 7(1)(c) applies only when a parent's lack of fitness continues over time so that third parties take on the parental role and establish a custodial environment—such an environment is established only if "*over an appreciable time* the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." MCL 722.7(1)(c) (emphasis added).

[14] Plaintiffs aptly observe that defendant's lack of fitness was the direct cause of their appointment as guardians—a status that bestows rights akin to parental rights. MCL 700.5215. They further note that defendant's absence from her children's lives thus created the very established custodial environment with plaintiffs that defendant now seeks to delegitimize by applying the constitutional presumption in favor of *fit* parents.

20

parents in an action involving the very people who cared for defendant's children in the face of her parenting failures.  For these reasons I conclude that when, as here, a third party establishes a custodial environment after proof of a parent's unfitness, the procedure for changing an established custodial environment mandated by MCL 722.27(1)(c) controls.

## IV.  CONCLUSION

In conclusion, I agree with the majority that a *fit* parent who properly seeks custody under the CCA benefits from the parental presumption in MCL 722.25(1).  But, contrary to the majority, I would conclude that, where a parent's lack of fitness is established, MCL 722.27(1)(c) controls if a third party has an established custodial environment for the children.

Further, if parental or custody rights are governed by other proceedings, a parent is precluded from using the CCA as an end run around such proceedings; rather, the first court to gain jurisdiction over these matters retains jurisdiction.  The CCA provides a single exception to this rule in MCL 722.26b, which plaintiffs properly invoked in this case and which permits guardians to seek custody although guardianship proceedings are ongoing.  But, finally, I agree with the majority that even when a custody action is properly filed under § 6b as here, the circuit court is not bound to award custody to any party.  Instead, it has broad discretion to act "for the best interests of the child . . . ."  MCL 722.27(1).  Accordingly, the court in its discretion may dismiss plaintiffs' custody action in light of plaintiffs' apparent attempt to subvert the ongoing guardianship

21

proceedings in which defendant was fulfilling increasing duties to her children and gaining increased visitation time.

Maura D. Corrigan