*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CARNEL HAYNIE, JR.,

       Plaintiff-Appellant,

v

SYLVIENASH B. MOMA,

       Defendant-Appellee.

UNPUBLISHED
May 18, 2023

No. 362341
Macomb Circuit Court
Family Division
LC No. 2020-001404-UN

Before: LETICA, P.J., and BORRELLO and RIORDAN, JJ.

PER CURIAM.

In this custody dispute, plaintiff appeals as of right the trial court's order granting the parties' joint legal custody over their minor children, with defendant awarded sole physical custody and plaintiff awarded parenting time. On appeal, plaintiff contends that the trial court erred in its custody determination—specifically in granting defendant sole physical custody—by incorrectly finding various best-interest factors in favor of defendant, particularly when the children had an established custodial environment with plaintiff in Michigan, not with defendant out of state. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

In 2001, defendant was a teenager when she immigrated to the United States with her parents from Cameroon. By the age of 16, she graduated high school and began to attend college where she met plaintiff. Their friendship later became romantic. While defendant attended nursing school, she worked nights and plaintiff insisted on driving and picking her up from work. Defendant became a nurse and continued her education to become a nurse practitioner. She purchased her own home in Pontiac, Michigan. The couple had an "on and off" relationship with defendant accusing plaintiff of cheating on her. Eventually, they married in 2012, and defendant gave birth to the couple's twins in 2015, CH and ZH.

After the twins' birth, the parties disputed who was the children's primary caretaker. Defendant testified that she stopped working to care for the children. And plaintiff contended that he dropped the children off at daycare and tended to the children after work. Although there was no domestic violence in the couple's relationship, plaintiff was convicted of an assault on

defendant's mother. Plaintiff alleged that he intervened when defendant's mother attempted to perform a "branding" on one of his children; an assertion that defendant denied. Plaintiff denied that he committed check fraud in another state and alleged that the acts were committed by an acquaintance; plaintiff merely paid the fine to resolve the matter.

Defendant testified that the couple planned to move to Colorado in 2018 to make a fresh start. There, defendant and the twins lived with defendant's uncle while plaintiff commuted back and forth to Michigan. Plaintiff hoped to work with an investor in Colorado on an application that he created. But defendant learned that plaintiff continued to cheat on her and she asked for a divorce. In December 2018, plaintiff came to Colorado to visit the children for the holidays and took them back to Michigan without defendant's consent.

Defendant testified that she attempted to contact plaintiff about returning the twins; however, plaintiff stopped communicating with her when she mentioned the divorce. Defendant attempted to locate the twins with police and court assistance, but her efforts were hampered without a valid court custody order. Defendant testified that she came to Michigan to search for the twins, contacted Children's Protective Services (CPS) to conduct a welfare check, and hired private investigators. Defendant testified that she obtained a judgment of divorce against plaintiff in Colorado, but it did not address custody of the children. Defendant eventually married a pastor and they lived in a five-bedroom home with her sister-in-law in Colorado. Defendant ceased operation of a wig business and managed her medical clinic.

Plaintiff contradicted defendant's testimony, testifying that defendant knew that he was returning to Michigan with the children and that she had sent a text about a visitation schedule. He denied hiding the children from defendant. He testified that he lived with a friend briefly in December 2018. Plaintiff later moved into his mother's home in Grand Blanc and then lived with his girlfriend in Sterling Heights. Plaintiff leased a home in Troy and now lived in Auburn Hills. He worked for a mortgage company and drove for a delivery service part-time. Plaintiff denied that he failed to apprise defendant of the children's education status, denied that he failed to provide nutritional meals for the children, and denied that he failed to address the children's medical needs. Plaintiff testified he placed the children in daycare and also had four babysitters to assist with child care.

In July 2020, plaintiff petitioned the trial court to register the 2019 Decree of Dissolution of Marriage (the 2019 decree) entered in Colorado and requested the court assume jurisdiction over the parties' children to determine custody, parenting time, and child support. Plaintiff requested that the court modify the 2019 decree to award him sole legal and physical custody of the children and to require that defendant pay child support. The parties ultimately consented to the court taking jurisdiction over the children to resolve these issues. Following initial proceedings, the trial court concluded that the children had an established custodial environment with plaintiff, and it awarded the parties, on an interim basis, joint legal custody over the children, with the children's primary residence in Michigan with plaintiff until further court order. The court also awarded plaintiff three weeks of parenting time in Michigan for every one week of defendant's parenting time in Colorado, and also referred the case for a Friend of the Court (FOC) investigation on custody, parenting time, and child support.

After issuance of a FOC referee's report and recommendation, de novo custody proceedings before the trial court occurred. Defendant testified that plaintiff removed the children from her care in Colorado without her knowledge and consent. She testified that she had a stable life in Colorado with her husband and family members. Defendant owned a five-bedroom home in Colorado where the twins would each have their own room. She selected an international school for the children to attend and enrolled the children in extracurricular activities such as dance and karate. Defendant testified that plaintiff did not communicate with her about the children. Specifically, he did not respond to text messages or emails through Family Wizard, he lacked stability as evidenced by an eviction, and he left the children unattended with strangers. Defendant asserted that plaintiff did not immediately respond to her concerns about CH's health, and the child was eventually diagnosed as underweight and suffered from an iron deficiency. Additionally, plaintiff did not address defendant's concern that ZH was entering puberty at age five and did not take the child for recommended laboratory testing. Defendant testified and provided documentary evidence that plaintiff did not respond to a CPS worker's request to perform a welfare check on the children, that plaintiff was evicted from the Troy home,[1] that plaintiff was involved in an altercation with defendant's private investigator that did not result in criminal charges, and that plaintiff did not facilitate defendant's parenting time, but denied it. Defendant also claimed that plaintiff leased the Pontiac home to a drug dealer without her consent, that plaintiff retained the rent, that the home was raided by federal authorities, and that the home was severely damaged.

Plaintiff testified that he was the children's primary caregiver, that he provided a stable home and nutritional meals, and that he had a support system for the children. Although plaintiff acknowledged eviction proceedings involving the Troy home, he contended that the landlord violated the terms of the lease by storing items in the home, and he voluntarily left. Plaintiff testified that he had stable employment. Additionally, all of the children's family and friends were nearby, including a half-sibling.[2] Plaintiff denied having any knowledge about the tenant having

---

[1] The landlord testified that plaintiff asserted he was "putting off" a CPS worker because of dangers in the home. However, plaintiff had locked various rooms in the home and claimed that others had the keys. The landlord testified that she visited the home and could hear smoke alarms ringing, signaling that the batteries were low. Because she was unable to enter the locked rooms and change the batteries, she asked plaintiff to do so, noting it was a hazard for the children. When the landlord eventually regained possession of the home, she learned that plaintiff did not replace the smoke alarm batteries but simply removed them. The landlord also opined that there was not much food in the home and that the children were not dressed appropriately for the weather. However, she acknowledged that, at the time of her observation, the children were in the home, not outside, and she made no report to CPS about the children.

[2] After the hearing concluded, defendant moved to supplement the record, citing a recent incident where the children were left without adult supervision while plaintiff was on vacation in California. It was alleged that defendant was on the phone with ZH when the child advised that plaintiff was away on an airplane. ZH was purportedly left with an "auntie," but when defendant asked to speak to her, ZH could not locate her. Defendant called the police to perform a welfare check, and the adult arrived a short time later. At this hearing, plaintiff represented that his new counsel had filed an answer but was unavailable for the hearing. Plaintiff requested an adjournment. The trial court

-3-

a criminal history. He also denied failing to keep defendant apprised of health and school information pertaining to the children. Plaintiff submitted that he did not wrongfully deprive defendant of parenting time, but claimed that the children's school schedule and court order altered parenting time. Curiously, plaintiff testified that he consulted with the Colorado police department on this parenting issue, not his counsel or the trial court order. Plaintiff introduced evidence that he took his children to church before the pandemic.

The court issued an oral opinion regarding custody, parenting time, and the other related issues. In relevant part, the court first concluded that the children had an established custodial environment with plaintiff given the length of time they had resided with him since leaving Colorado in December 2018.[3] Accordingly, defendant needed to support any change to this established custodial environment by clear and convincing evidence. Concerning the children's best interests, the court found best-interest factors (a), (b) and (g) even between the parties; factor (i) irrelevant due to the age of the children; and factors (c), (d), (e), (f), (h), (j), and (k) favored defendant with no other relevant considerations under factor (*l*). The court noted that joint legal custody was never disputed and concluded that defendant should be awarded sole physical custody with plaintiff having parenting time during school breaks and for the majority of each summer. The court determined that defendant met her burden to provide clear and convincing evidence that this change in the established custodial environment would be in the children's best interest. The trial court subsequently entered the final order in this case incorporating these conclusions. Plaintiff appeals.

## II. STANDARD OF REVIEW

A trial court's order concerning child custody "shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010), quoting MCL 722.28. "In the context of child custody cases, there are findings of ultimate facts, i.e., a finding regarding each factor, and there are findings of ordinary or evidentiary facts. The great weight of the evidence standard applies to all findings of fact." *Fletcher v Fletcher*, 447 Mich 871, 879; 526 NW2d 889 (1994). "[A] reviewing court should not substitute its judgment on questions of fact unless the factual determination clearly preponderate[s] in the opposite direction." *Pierron*, 486 Mich at 85 (quotation marks and citation omitted; second alteration in original). Furthermore, in reviewing a trial court's findings, this Court should defer to any determinations of credibility made below. *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011).

---

indicated that it would take the matter under advisement and issue an order. We could not locate any order in the lower court record.

[3] The court acknowledged that plaintiff claimed he was essentially allowed to return to Michigan with the children but defendant asserted that plaintiff effectively kidnapped the children as further evidenced by his attempts to evade service. Yet, the court did not make a credibility finding on this disparity.

A trial court's discretionary rulings in a custody dispute are reviewed for a palpable abuse of discretion, see MCL 722.28, which occurs "when the trial court's decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias," *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008).

## III. ANALYSIS

Plaintiff asserts that the trial court erred in granting defendant sole physical custody because it incorrectly found various best-interest factors in defendant's favor despite the children's established custodial environment with plaintiff in Michigan, not with defendant in Colorado. We disagree.

Custody disputes must generally be resolved by determining the best interests of the child under the standardized statutory factors provided in MCL 722.23. *Howard v Howard*, 310 Mich App 488, 497; 871 NW2d 739 (2015). A child's best interests means the "sum total" of all the factors outlined in MCL 722.23, including:

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a

child or that parent from sexual assault or domestic violence by the child's other parent.

> (k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

> (*l*) Any other factor considered by the court to be relevant to a particular child custody dispute. [MCL 722.23.]

Furthermore, because a trial court may not "issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child," MCL 722.27(1)(c), it must generally make a finding of whether an established custodial environment existed with either or both parties before evaluating a child's best interests. See *Kubicki v Sharpe*, 306 Mich App 525, 540; 858 NW2d 57 (2014). An established custodial environment exists "if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort," MCL 722.27(1)(c). A custodial environment may arise from a temporary custody order, a violation of a custody order, or even in the absence of a custody order. See *Berger*, 277 Mich App at 707. Further, an established custodial environment may exist with both parents. *Id*. If a proposed change would modify an established custodial environment, then the proponent of the change must prove by clear and convincing evidence that it is in the child's best interests. See *Pierron*, 486 Mich at 92.

In this case, plaintiff submits that defendant failed to provide clear and convincing evidence "of any compelling reason to disturb" the established custodial environment in which the children were thriving with him in Michigan. Plaintiff specifically claims that the trial court erred by finding that best-interest factors (c), (d), (e), (f), (h), and (j) all favored defendant. We disagree.

## A. BEST-INTEREST FACTOR (c)

In finding factor (c) (capacity and disposition of parties to provide child with material needs) favored defendant, the court reasoned that defendant had only "a slight edge" given the testimony that CH was underweight and had an iron deficiency, and that plaintiff's home lacked food. Plaintiff contends that this finding was against the great weight of the evidence because: (1) CH's weight and iron levels had no bearing on the "capacity and disposition" to provide medical care and that plaintiff took CH to the doctor to address his care, (2) that a biased witness, the Troy landlord, attested about her belief that there was not much food in the home; and (3) that the trial court did not expressly find that defendant could provide food, clothing, and medical care.

We conclude that the trial court's decision to slightly favor defendant on this factor was not against the great weight of the evidence. As an initial matter, "a trial court need not consider every piece of evidence entered and argument raised by the parties when it states its factual findings and conclusions on each of the best interest factors." *Kessler v Kessler*, 295 Mich App 54, 65; 811 NW2d 39 (2011) (quotation marks and citation omitted). "A trial court's failure to discuss every fact in evidence that pertains to a factor does not suggest that the relevant among them were overlooked." *Id*. (quotation marks and citation omitted). See also *MacIntyre v MacIntyre (On Remand)*, 267 Mich App 449, 452; 705 NW2d 144 (2005) ("[Best-interest] findings

and conclusions need not include consideration of every piece of evidence entered and argument raised by the parties. However, the record must be sufficient for this Court to determine whether the evidence clearly preponderates against the trial court's findings."). Accordingly, the court did not need to explicitly reference defendant's capacity or each piece of evidence in its analysis.

And, deferring to the trial court's superior ability to weigh credibility, the evidence does not clearly preponderate against the court's finding. There admittedly is no concern over either parties' provision of clothing or other general necessities; however, the parties specifically disputed whether plaintiff was adequately responsive to the children's medical needs. Additionally, while the children were insured with plaintiff, he admitted not providing any information to defendant when his and the children's insurance changed. Additionally, defendant provided extensive testimony regarding her efforts to have plaintiff address the children's medical needs and to access their medical records. But plaintiff generally failed to communicate with her on the children's medical needs and treatment.

Furthermore, there was evidence that plaintiff did not adequately provide the children food. Curiously, plaintiff testified that the children did not really like food. And after CH was taken to the doctor, it was learned that he was significantly underweight, despite being athletic, and suffered from an iron deficiency, requiring supplements. Defendant testified that, while she believed plaintiff provided the children food, the children's diet lacked nutrition because they mostly ate fast food with plaintiff. Contrary to plaintiff's assertion, there was ample evidence, aside from the landlord's testimony, that plaintiff did not provide nutritional meals to the children. The trial court's determination on this factor was supported by the evidence.

## B. BEST-INTEREST FACTOR (d)

In finding factor (d) (length of time child has lived in stable, satisfactory environment, and desirability of maintaining continuity) favored defendant, the court reasoned that the children's environment with plaintiff had not necessarily been stable because he had moved around so much, whereas defendant "doesn't jump around as much." Plaintiff alleges that this finding was against the great weight of the evidence because: (1) the trial court never evaluated the desirability of maintaining the children's continuity with him; (2) failed to consider the family and friend relationships established while in plaintiff's care; (3) failed to consider his stable employment and insurance benefits; (4) gave undue weight to the Troy eviction dispute and his housing moves; and (5) incorrectly evaluated defendant's environment in Colorado when she had not lived there with the children for an appreciable period of time.

We conclude that the trial court's decision to favor defendant on this factor was not against the great weight of the evidence. "Factor (d) is properly addressed by considering the environments in which the child has lived in the past and the desirability of maintaining the continuity of those environments." *Demski v Petlick*, 309 Mich App 404, 448-449; 873 NW2d 596 (2015).[4] Frequent moves may not necessarily deprive the child of a stable satisfactory

---

[4] Plaintiff's reliance on *Demski* is misplaced. In *Demski*, the plaintiff was the biological father of MP. However, the defendant mother married her husband hours before MP's birth and sought to

environment and continuity, and a punishment should not be imposed for having to move. See *Phillips v Jordan*, 241 Mich App 17, 27-28; 614 NW2d 183 (2000). However, an examination should occur, whether as a whole, the child's daily needs were met. *Id*.

There was no indication that the trial court punished plaintiff for his moves. Rather, with each move, there was a change in circumstances for the children. The children went from having their own rooms to sharing a room and from attending a school to moving to a completely new school district. The trial court also noted that the moves altered the children's roommates. The children previously lived with plaintiff's girlfriend and their half-sibling, but plaintiff moved the children from that apartment to Troy.[5] Indeed, the crux of the court's analysis was that plaintiff's environment was unstable. Contrary to plaintiff's assertion, the trial court did not speculate on defendant's future environment because the children spent weekly visits with defendant in the home she purchased in Colorado. Ultimately, the trial court properly favored defendant on this factor given its determination of the instability of plaintiff's environment, which was adequately supported in the record through plaintiff's frequent and numerous moves to various cities with the children. Furthermore, the trial court's omission in referencing facts now raised by plaintiff does not mean these facts were overlooked. See *Kessler*, 295 Mich App at 65.

## C. BEST-INTEREST FACTOR (e)

In finding factor (e) (permanence of existing or proposed custodial home(s)) favored defendant, the court reasoned that plaintiff moved around frequently since December 2018 and at some points required third-party assistance for housing, whereas defendant had only moved once and was paying the mortgage for her current home. Plaintiff submits that this finding was against the great weight of the evidence because the court: (1) improperly considered his multiple moves with the children as evidence of instability; (2) should have considered the permanence of the custodial unit regardless of the family's moves; (3) erroneously disregarded the impact of removing the children from their extensive family support system in Michigan, and (4) erroneously determined that defendant had paid off the mortgage on her current home. The trial court did not err in its determination addressing this factor.

The evidence showed that plaintiff and the children lived in five locations after returning to Michigan in December 2018. They spent a few days at plaintiff's friend's home, almost 10 months with the paternal grandmother in Grand Blanc, a year with plaintiff's girlfriend in Sterling

---

have the plaintiff waive any rights to MP. Addressing factor (d), we held that the trial erred in failing to acknowledge the mother's continuity with MP and by considering the appropriateness of the plaintiff's future environment with MP. *Demski*, 309 Mich App at 411-421, 448-449. In our case, the trial court did not consider the children's *future* environment with defendant because defendant testified regarding her relationship with the children before they were removed by plaintiff to Michigan and her current weeklong visits with the children under the existing court order.

[5] We note that plaintiff blamed defendant for this move, contending that the incident with the private investigator placed plaintiff's girlfriend in fear. The trial court did not validate this assertion.

Heights, another year in Troy, and they moved to Auburn Hills in September 2021. Notably, although plaintiff did not rely on a third-party for housing assistance when leasing the Troy home, he was evicted from the premises after failing to pay rent and utilities. These facts question the permanency of plaintiff's custodial home, particularly, whether continued instability was likely. In contrast, defendant had lived in just two homes since moving to Colorado, and had lived in the same home since March 2020 with her current husband and other family. And while nothing in the record explicitly provided that defendant was paying or paid off the mortgage, defendant said she purchased this home, presumably with her current husband, and she had never had any issues being evicted or removed, or otherwise paying utilities.

With regard to factor (e), the trial court should not consider acceptability of the custodial unit rather than permanence in its findings. *Brown v Brown*, 332 Mich App 1, 21; 955 NW2d 515 (2020). "The stability, health, or safety of the environment provided by a party is considered in other factors." *Id*. Therefore, it was still proper for the trial court to base this factor on the physical permanence, or lack thereof, of plaintiff's custodial environment. And even if this reasoning was improper, the trial court's ultimate decision to favor defendant on the permanence, as a family unit, of the parties' custodial homes was not against the great weight of the evidence.

While the children have admittedly lived mostly with plaintiff since returning to Michigan in December 2018, their family unit with him, regardless of where the three stayed and plaintiff's stable presence in the children's lives, continued to fluctuate. In particular, the children lived for a few days with some friend of plaintiff's, almost a year with the maternal grandmother, a year with plaintiff's girlfriend, and otherwise just with plaintiff. These constant changes to the children's family unit with plaintiff weighed in favor of defendant under this factor. And since October 2020, the children have spent ample time (one quarter of every month) with defendant and her new family in Colorado. Again, the trial court's failure to explicitly mention the children's family and support system in Michigan does not mean these facts were overlooked. See *Kessler*, 295 Mich App at 65.

## D. BEST-INTEREST FACTOR (f)

In finding factor (f) (parties' moral fitness) to favor defendant, the court reasoned that there did not appear to be any concerns regarding defendant, but it expressed concern about plaintiff. The court noted that it was not considering plaintiff's affairs for the purposes of his morality, but stated that his domestic-violence conviction against the maternal grandmother was "not great." The court also noted that plaintiff made it difficult for defendant to locate the children and that he attempted to evade service. Plaintiff submits that this finding was against the great weight of the evidence because: (1) it did not recognize that defendant's business was investigated and removed from providing vaccinations; (2) it concluded that plaintiff had several affairs even though defendant's allegations were unproven; (3) it considered plaintiff's assault conviction involving his former mother-in-law twice in factor (f) and (k); and (4) it concluded that plaintiff tried to evade defendant's efforts to locate and serve him. Plaintiff alleged that these factors had no bearing on moral fitness as it related to his ability to parent his children.

As an initial matter, we note that the trial court expressly stated that it would not consider any infidelity in addressing moral fitness. And regarding plaintiff's reliance on the court double-weighing his assault conviction, a single circumstance may be relevant to and considered in

determining multiple best-interest factors because the factors have some "natural overlap." *Fletcher v Fletcher (After Remand)*, 229 Mich App 19, 25-26; 581 NW2d 11 (1998).

Furthermore, we disagree with plaintiff that defendant's business practices are relevant under this factor. "[A] spouse's questionable conduct is relevant to factor f only if it is a type of conduct that necessarily has a significant influence on how one will function as a parent." *Berger*, 277 Mich App at 712 (quotation marks, citation, and emphasis omitted). "Examples of such conduct include, but are not limited to, verbal abuse, drinking problems, driving record, physical or sexual abuse of children, and other illegal or offensive behaviors." *Id*. at 712-713 (quotation marks and citation omitted). "Trial courts must look to the parent-child relationship and the effect that the conduct at issue will have on that relationship." *Id*. at 713 (quotation marks and citation omitted). "Thus, under factor f, the issue is not who is the morally superior adult, but rather the parties' relative fitness to provide for their child, given the moral disposition of each party as demonstrated by individual conduct." *Id*. (quotation marks and citation omitted).

There was only isolated testimony about the business's authority to administer vaccines being revoked, but nothing to indicate any illegal or offensive behaviors that significantly impacted defendant's ability as a parent. And plaintiff makes no such connection in his argument on appeal. In contrast, it is clear, even without specifics provided in the trial court's reasoning, that plaintiff's assault of the maternal grandmother, a member of his own family at that time whom he assaulted in front of the children, no less, affected his moral fitness as a parent.

Furthermore, a considerable amount of the trial court testimony centered on whether plaintiff acted in good faith when removing the children to Michigan and subsequently acted to keep them from defendant. We defer to the trial court's credibility determination in accepting defendant's testimony and evidence addressing plaintiff's actions, and its conclusion that such conduct did, in fact, implicate plaintiff's moral fitness as a parent. Specifically, plaintiff's conduct seemed particularly designed to prevent the children from having any continued relationship with defendant,[6] without regard to the import this parental estrangement would have on the children. For these reasons, we conclude the trial court's decision to favor defendant on this factor was not against the great weight of the evidence.

## E.  BEST-INTEREST FACTOR (h)

In concluding that factor (h) (child's home, school, and community record) favored defendant, the court reasoned that the children had been in at least three different school systems while in plaintiff's care. Plaintiff was unclear when providing information on the children's school enrollment and defendant had trouble obtaining such information. Plaintiff submits that this finding was against the great weight of the evidence because the court never made any findings regarding the children's actual home, school, or community *records* with him, which were good. Because the children were properly enrolled in school, thrived, made friends, and defendant

---

[6] Defendant presented the testimony of the CPS worker that contacted plaintiff and attempted to perform a welfare check on the children. After locating plaintiff's address, the CPS worker closed out the investigation without success, failing to gain access to the children despite reaching plaintiff on the phone and requesting police involvement.

ultimately obtained the children's records, he contends that the trial court's finding was against the great weight of the evidence.

First, although the trial court never explicitly mentioned the children's grades or friends, it does not mean these facts were overlooked. See *Kessler*, 295 Mich App at 65. Furthermore, defendant testified extensively regarding plaintiff's failure, before and during this case, to involve or even update her on the children's schooling, despite her repeated inquiries on the topic. It is also undisputed that the children were enrolled late in Avondale schools, missed some time, and attended three different schools in separate cities during their time with plaintiff, thus questioning the consistency of the children's school record with plaintiff. And while plaintiff testified that the switch to Avondale was made for the children's best interests, it actually appeared to have been a move of necessity after plaintiff was evicted from his home in Troy and could not provide proof of residency to continue the children's kindergarten in that district. Under these circumstances, we conclude that the trial court's decision to favor defendant on this factor was not against the great weight of the evidence.

F. BEST-INTEREST FACTOR (j)

In finding factor (j) (parties' willingness and ability to facilitate close and continuing parent-child relationship) in favor of defendant, the court reasoned that the trial testimony demonstrated plaintiff's unwillingness "to facilitate the way you would want the relationship," showing enmity for defendant that she did not display toward him. Plaintiff asserts that this finding was against the great weight of the evidence (or otherwise unsupported by clear and convincing evidence) because plaintiff provided the children with cell phones to allow them direct contact with defendant at their leisure. He also notes defendant's significant parenting time during the pendency of this case as further relevant and countering the trial court's finding. We disagree.

As discussed, defendant testified extensively to plaintiff's efforts to keep the children from her. She also testified extensively to plaintiff's general lack of communication regarding the children's schooling and medical treatment, among other things, and his failure to consult her on these issues. Defendant testified that she used text messages and Family Wizard to communicate with plaintiff, but he failed to timely respond to her inquiries, if at all. Further, defendant was able to acquire parenting time with the children only after plaintiff initiated this petition. Plaintiff was also held in contempt for improperly denying defendant's parenting time in September and October 2021. Furthermore, recent cooperation does not dispel plaintiff's countless acts to isolate the children from defendant and impair their relationship with her. And plaintiff's issues with communication and parental involvement continued well into this case and even after he was required to involve defendant in the children's upbringing. Given these facts, the trial court's decision to favor defendant on this factor was not against the great weight of the evidence.

In sum, the trial court did not make findings against the great weight of the evidence in concluding that best-interest factors (c), (d), (e), (f), (h), and (j) all favored defendant. And the court did not palpably abuse its discretion by awarding defendant sole physical custody.

Affirmed.

/s/ Anica Letica
/s/ Stephen L. Borrello
/s/ Michael J. Riordan